IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| KA'TORIA GRAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:17-cv-595-RAH |
| | ) | [WO] |
| KOCH FOODS, INC., *et al*., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This employment discrimination lawsuit was filed by Ka'Toria Gray against her

former employer, Koch Foods of Alabama, LLC (Ala-Koch), Ala-Koch's parent company,

Koch Foods, Inc. (Koch Foods), and former Ala-Koch employees, Melissa McDickinson

and David Birchfield, both of whom were human resource (HR) managers for Ala-Koch.

This matter comes before the Court on the following motions: Ala-Koch's Motion for

Summary Judgment and Renewed Motion for Judgment on the Pleadings (Doc. 251), Koch

Foods's Motion for Summary Judgment (Doc. 248), McDickinson's and Birchfield's

Motions for Summary Judgment (Docs. 249, 250), and Gray's Motion for Summary

Judgment (Doc. 253).  These motions have been fully briefed and are ripe for decision. For

the following reasons, the pending motions are due to be granted in part and denied in part.

## I.    BACKGROUND

When it comes to the facts of this case, the parties are not in the same book, let alone

on the same page.  Nearly every fact, whether material or immaterial, is disputed to the

point where it seems that if one party says the sky is blue the other mechanically says it is

red.  To illustrate this duality, one need look no further than the evening on which much of Gray's case is based—November 14, 2015.  That night, Gray alleges she was sexually assaulted by McDickinson and Birchfield at McDickinson's house.  Birchfield, in response, claims that not only was he never at the house that night, he was not even in the same city.  Of course, both parties have witnesses saying  Birchfield either was or was not present that night.  Someone is incorrect.  But it is not the Court's role at this procedural stage to determine who that is.

The following facts are either undisputed or written in the light most favorable to the nonmovant.[1]

### A.  Koch Foods, Ala-Koch, and HR

Ala-Koch is a limited liability company that owns and operates several chicken processing facilities in Alabama, including a de-bone facility in Montgomery, Alabama.  Koch Foods is the sole member of Ala-Koch and several other chicken processing entities.  (Doc. 276 at 2.)

At all relevant times, Koch Foods maintained an anti-harassment and nonretaliation policy that its subsidiaries, such as Ala-Koch, were required to follow. (Doc. 247-1 at 168–174.)  That policy outlined the procedure for reporting harassment.  Employees were to report, "either orally or in writing," any harassment to their respective shift manager, plant manager, complex manager, or complex HR manager, which then would trigger an

---

[1] The record is rife with factual disputes, competing narratives, and spin, but the Court has only considered evidence that is admissible on its face or can be reduced to admissible form and which complies with Federal Rule of Civil Procedure 56. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986); *Macuba v. DeBoer*, 193 F.3d 1316, 1322–24 (11th Cir. 1999).

2

investigation.  But if an employee felt uncomfortable contacting any of the listed persons, or believed an investigation following a complaint was inadequate, the employee could instead contact the corporate director of human resources.  The policy also contained an anti-retaliation provision that listed the "HR Manager, Complex HR Manager or Complex Manager" as individuals to whom to report retaliation. (Doc. 242-1 at 178–79.)

Additionally, Ala-Koch provided annual harassment and discrimination training to its management. In this training, Ala-Koch instructed its managers that "[s]hould an employee" learn about harassment or discrimination, "the employee <u>must</u> report it immediately." (Doc. 242-1 at 252.)

### B.  Gray is Hired at Ala-Koch

Gray began working at Ala-Koch in 2011 as a nurse in the safety department at the Montgomery de-bone facility.  Gray's day-to-day work primarily consisted of providing medical treatment to Ala-Koch employees.  In the early days of her employment, Gray did not report to any one particular supervisor, but she was eventually placed under the supervision of Frank Sheley, the de-bone facility complex safety manager.

Despite being new to the company, Gray maintains that she never received a description of her job duties, never underwent orientation, never received copies of the company's policies, including the anti-harassment policy, and never had the policies reviewed with or explained to her. (Doc. 276 at 22.)  The record reveals, however, that Gray signed the anti-harassment policy itself. (Doc 247-1 at 168–170.)

### C.  Prior Complaints About McDickinson and Birchfield

This case arises from incidents of alleged harassment committed by McDickinson and Birchfield against Gray that began in mid-November 2015, but concerns about McDickinson and Birchfield's behavior began months earlier.

In 2014, Birchfield, Ala-Koch's complex HR manager, hired McDickinson as an HR supervisor and later promoted her to HR manager of the Montgomery de-bone plant, one of three departments Birchfield supervised.  Birchfield reported to Bobby Elrod, a Koch Foods employee and the corporate director of human resources for all Koch Foods entities,[2] while McDickinson reported to and was supervised by Birchfield. (Doc. 272-11 at 16–17.)

In early 2015, rumors spread throughout the Montgomery facility that McDickinson was having sex with numerous Ala-Koch employees in exchange for time off.  The rumors garnered enough traction that on August 5, 2015, a union steward reported the rumors to Birchfield. (Doc. 242-1 at 312.)  Several days later, on August 10, 2015, Randy Davenport, the plant manager, notified Birchfield that he had heard that McDickinson had sexually harassed Harvey Fuller, another Ala-Koch employee, and that McDickinson had ongoing sexual relationships with several other workers. (*Id*. at 314–18.) Davenport was "very concerned" and felt that there should be "further investigations." (*Id*. at 318.)

Acting on that concern, Davenport notified Wally Lewis, Koch Foods's regional vice president, of the rumors about McDickinson. (Doc. 242-8 at 271.) Lewis then

---

[2] Defendants dispute that Elrod is a Koch Foods employee because his paycheck is issued by Koch-Mississippi and his office is located in Gadsden, Alabama. (Doc. 247-7 at 23.) However, Elrod testified in his deposition that he worked for Koch Foods. (*Id*. at 22.)

instructed Birchfield to investigate.  Birchfield claims to have performed a thorough investigation that included  interviews with everyone implicated and that they all denied any improper sexual activity. (Doc. 283 at 35.)

At this point, Birchfield had not been implicated in any sexual activity with McDickinson or any other employee at Ala-Koch.  But that changed over the next few weeks.   On October 9, 2015, Harvey Fuller filed an EEOC charge alleging that McDickinson had sexually harassed him. (Doc. 242-1 at 3.) The record is unclear as to when Ala-Koch first learned of Fuller's EEOC charge.

### D.  The Incident in McDickinson's Garage

Gray entered the picture in mid-November 2015.  On the night of Saturday, November 14, 2015, McDickinson invited Gray to her house.  According to Gray, during a phone call, McDickinson told Gray that she and Birchfield wanted to talk with her about "some stuff from work" and "that there was some other people there from work." (Doc. 242-4 at 30.) When Gray asked McDickinson about the work "stuff," McDickinson replied that she would tell Gray when she arrived. (*Id*.) Believing that she would be attending a work-related matter, that other co-workers would be present, and that McDickinson could fire her, Gray decided to attend. (*Id*. at 31–33.)

When Gray arrived at McDickinson's house, she was greeted by Steven Jackson, another Ala-Koch employee, who told Gray to enter through the garage. (*Id.* at 34.) When Gray entered the garage, she was surprised to find that only McDickinson and Birchfield

were present.[3] (*Id.* at 35–36.) McDickinson and Birchfield offered Gray alcohol but she declined. (*Id.* at 36.)

Small talk ensued, and at some point, Birchfield took a picture of Gray and McDickinson sitting next to each other.[4] (Doc. 247-5 at 31.)

Conversation in the garage eventually turned to work-related topics, but not in the way that Gray expected.  At one point, McDickinson told Gray that she knew Gray had applied for a promotion to a new position, that Birchfield was going to give her that position, and that she would work with Gray to "get rid of" Betty Stabler, another employee at Ala-Koch. (Doc. 242-4 at 40.)

McDickinson and Birchfield also repeatedly asked Gray if they could trust her, and McDickinson even asked Gray to help her with some of McDickinson's school-related assignments, a request that Gray considered to be cheating. (*Id.* at 40–44.)

After the conversation regarding McDickinson's school work, the atmosphere in the garage shifted and became overtly sexual.  According to Gray, while sitting in the chair next to Gray, McDickinson leaned in towards Gray, put her hand on Gray's knee, and said that Gray smelled "really good." (*Id.* at 44.)  Gray moved McDickinson's hand away and said thank you.  McDickinson then leaned in again and told Gray that she was attracted to her, something that McDickinson apparently had confided in Steven Jackson, Ala-Koch's union steward, before this evening. (Doc. 272-13 at 4.)

---

[3] Whether Birchfield was present at the residence that night is a hotly contested issue. (*See* Doc. 250-1 at 4 ("Defendants insist Birchfield was not at McDickinson's house on November 14th.")).

[4] Defendants contend that this is a picture of Gray kissing McDickinson on the cheek.

All the while, Birchfield was sitting nearby, watching.  Gray told McDickinson that McDickinson was making her uncomfortable, especially with Birchfield there. (Doc. 242-4 at 45.)  McDickinson replied that she wore the pants in the relationship with Birchfield, and she then asked Gray if she wanted to dance. (*Id.*)  Birchfield then chimed in, saying that he wanted to watch them dance. (*Id.*) Gray said she did not want to dance, but McDickinson grabbed Gray's hand, pulled her up, and continued to encourage her to dance. (*Id.*) When Gray refused, McDickinson instructed Birchfield to fix Gray a drink—forcing Gray to once again decline. (*Id.*)

Things rapidly escalated, according to Gray.  Birchfield came up behind Gray and said, "go on I want to see you all dance." (*Id.*)  Birchfield then pressed into Gray's back while McDickinson pressed her body into Gray's front.  As Gray puts it, McDickinson and Birchfield "sandwiched" her. (*Id.*)  As they pressed against her, Birchfield leaned in and said into Gray's ear that he wanted to kiss her and that he had never kissed someone with braces before.  (*Id.*) Alarmed, Gray turned around toward Birchfield, who pulled her in and kissed her on the mouth. (*Id.* at 46.)  Gray pushed Birchfield back and tried to move out from between them.  As Gray attempted to free herself, McDickinson grabbed Gray's hand and attempted to place it on McDickinson's own breasts. (*Id.* at 45.) Gray jerked her hand away and backed away from McDickinson. (Doc. 273-1 at 4.)  McDickinson then asked Gray to have sex with her and Birchfield, but Gray refused. (*Id.*)  Rebuffed, McDickinson suggested instead that just she and Gray could have sex while Birchfield watched.  Again, Gray refused. (Doc. 242-4 at 46; Doc. 273-1 at 4.)

In yet another escalation, according to Gray, McDickinson then pulled Birchfield's pants down, pulled out his penis, and began to perform oral sex on him in front of Gray. (Doc. 242-4 at 46; Doc. 273-1 at 4.)

Shocked and terrified, Gray fled to the bathroom (Doc. 273-1 at 4), composed herself, and then fled from the house (Doc. 242-4 at 51–52).

### E.  Gray's Complaints About the Garage Incident

Gray discussed the garage incident with at least six Ala-Koch employees: (1) Francisco Santos, shift manager; (2) Sabrina Bell, payroll clerk; (3) LaTonya Lockley, quality assurance manager; (4) Tim Berry, production supervisor;  (5) Sherri Gonzalez, human resources clerk; and (6) Kathy Denton, a human resource generalist. (Doc. 242-4 at 54–55; Doc. 242-6 at 177.)

Of these individuals, the only person designated by Ala-Koch to receive harassment complaints under Ala-Koch's policy was Santos. The exact date of Gray's discussion about the garage incident with Santos is unclear, but Santos recalls that it could have been the day after the garage incident.[5] (Doc. 242-9 at 203.)  Gray states that she went to Santos specifically because he was the shift manager and because, given that two high ranking HR

---

[5] The Defendants claim that Gray testified this conversation could have occurred "months after" November 14, 2015, but Santos testified that Gray claimed that the incident occurred the night before. (Doc. 242-9 at 203.)

managers were the subjects of her complaint, she "didn't know anybody else to tell."[6] (Doc. 242-4 at 55.)

In his deposition, Santos confirmed that Gray told him that McDickinson and Birchfield performed oral sex in front of her but that Gray did not tell him that McDickinson and Birchfield made a pass at her or touched her. (Doc. 242-9 at 203.) Santos also testified that he did not report this conversation to anyone else at Ala-Koch because he believed that Gray "wasn't complaining to me about it . . . she was just talking to me about it." (*Id.* at 209.)

### F. The Incident in McDickinson's Office

About a week after the garage incident, McDickinson summoned Gray to her office. (Doc. 242-4 at 52.) Gray walked in, where she observed McDickinson sitting at her desk with her shirt unbuttoned. McDickinson then approached Gray and brushed her breasts against Gray. Gray backed away, told McDickinson that she was not interested, and left the room. (*Id.* at 53.)

This was the last occasion in which McDickinson touched Gray (*Id.*), though McDickinson continued to text-invite Gray to her house, and even invited Gray to the beach with her and Birchfield (Doc. 273-1 at 5). These social invitations stopped in late February 2016. (Doc. 242-4 at 98.)

---

[6] Gray testified that she did know she could also report the incident to Elrod and that the other reason she did not do so was because she "did not feel comfortable telling Bobby Elrod." (Doc. 242-4 at 55.)

### G. Gray's Departure from Ala-Koch

Since her first days at Ala-Koch, Gray had issues with Betty Stabler, another nurse at Ala-Koch. Their conflict came to a head in early 2016. On March 14, 2016, believing Stabler was discriminating against her by assigning her substantially more hearing tests than her white counterparts (Doc. 276 at 34), Gray lodged a complaint via email to Frank Sheley, her then-supervisor, and copied McDickinson and Birchfield. In her email, Gray claimed that Stabler's treatment "created a hostile work environment." (*Id.*) She did not complain about McDickinson or Birchfield in her email.

On March 21, 2016, Gray met with McDickinson and Birchfield to discuss Gray's issues with Stabler. During the meeting, Birchfield told Gray that, going forward, McDickinson would supervise Gray, a move that Gray deemed to be a method of control and harassment. (Doc. 273-1 at 5.)

Approximately three weeks later, on April 14, 2016, McDickinson issued Gray a "memorandum of understanding," or warning, concerning Gray's alleged failure to report two recent absences. According to Gray, she had cleared these absences with another HR employee because McDickinson had been absent from work. (Doc. 242-2 at 82.)

Gray filed an EEOC charge four days later, on April 18, 2016, alleging that she had been sexually harassed by McDickinson and Birchfield on November 14, 2015, that she had experienced retaliation for rejecting their advances, and that she believed she would be subjected to future discipline if she continued to refuse their sexual requests. (Doc. 242-4 at 84; Doc. 247-5 at 5.)

Nine days after filing the EEOC complaint, Gray complained to Sherri Gonzalez in HR about McDickinson's and Birchfield's actions during the garage incident (Doc. 242-3 at 166–175), and she further stated that she believed she was disciplined by McDickinson because she would not have sex with McDickinson and Birchfield.

Instead of notifying her supervisors of Gray's complaint about McDickinson and Birchfield, Gonzalez reported Gray's complaint back to McDickinson and Birchfield, the very subjects of the complaint. (Doc. 246-1 at 25.)

Gray resigned from Ala-Koch the following day on April 29, 2016. (Doc. 247-5 at 15.)

### H. The Alabama Nursing Board Complaint

Despite Gray's April 29, 2016 departure from Ala-Koch, Birchfield decided to file a complaint about Gray with the Alabama Board of Nursing, claiming that on April 27, 2016, Gray had refused to properly treat an Ala-Koch employee with a head wound. (Doc. 242-8 at 125–26.) According to Gray, the complaint was fabricated by McDickinson and Birchfield in an attempt to retaliate against her for filing the EEOC charge against them only weeks earlier. (Doc. 276 at 46.)

The nursing board investigated and found that the complaint had merit and that Gray was due to be admonished for not appropriately treating the employee. (Doc. 247-5 at 18.) The record does not reveal what role McDickinson and Birchfield played in the nursing board's investigation.

In November 2016, Gray filed a second EEOC charge, this time alleging that Birchfield's nursing board complaint was retaliatory. (Doc. 252 at 18–19.)

## I.  McDickinson and Birchfield Today

McDickinson and Birchfield both resigned from Ala-Koch in 2016 after Gray filed her EEOC complaint. They both contest Gray's accusations regarding the garage incident and dispute any allegation of workplace misconduct.  And although they deny allegations of a romance during their employment at Ala-Koch, McDickinson and Birchfield are now married.[7]

## II.    THE PARTIES' LITIGATION

Gray filed suit on September 5, 2017 against McDickinson, Birchfield, Ala-Koch and Koch Foods. (Doc. 1.)  In her Third Amended Complaint (Doc. 5), the operative one here, Gray brings the following federal and state law claims:

- Count I – Invasion of Privacy Against All Defendants

- Count II – Assault and Battery Against All Defendants

- Count III – Outrage Against All Defendants

- Count IV – Negligent/Wanton Supervision, Training and Retention Against Ala-Koch and Koch Foods

- Count V – 42 U.S.C. § 1981 and Title VII Retaliation for Race Discrimination Against Ala-Koch and Koch Foods

- Count VI – Title VII Sexual Harassment Against Ala-Koch and Koch Foods

- Count VII – Title VII Retaliation for Sexual Harassment Against Ala-Koch and Koch Foods

---

[7] During oral argument, defendants' counsel represented to the Court that McDickinson and Birchfield are now married. (Doc. 405.)

In response, McDickinson and Birchfield brought state law counterclaims against Gray for:

- Count I – Defamation

- Count II – Invasion of Privacy

## III.    JURISDICTION AND VENUE

Subject matter jurisdiction is conferred by 28 U.S.C. § 1331 as to Gray's federal causes of action, and the Court exercises supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.  The parties do not contest personal jurisdiction or venue, and there are adequate allegations to support both. *See* 28 U.S.C. § 1391.

## IV.    STANDARD OF REVIEW

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a), (c).  No genuine issue of material fact exists if the opposing party fails to make a sufficient showing on an essential element of her case as to which she would have the burden of proof.  *Celotex*, 477 U.S. at 322–23.

Just as important, the "mere existence of a scintilla of evidence in support of the [non-moving party's] position" is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986).  In making this assessment, the Court must "view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," *Stewart v. Happy Herman's Cheshire Bridge, Inc*., 117 F.3d 1278, 1285 (11th Cir. 1997), and "resolve all reasonable

13

doubts about the facts in favor of the non-movant," *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am.*, 894 F.2d 1555, 1558 (11th Cir. 1990).

The applicable Rule 56 standard is not affected by the filing of cross-motions for summary judgment. *See, e.g.*, *Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005).  "Cross-motions . . . will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed."  *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (per curiam) (citation omitted).  When both parties move for summary judgment, the Court must evaluate each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *See Am. Bankers Ins. Grp.*, 408 F.3d at 1331.

## V.    DISCUSSION

### A.  Gray's Federal Claims

Gray brings three federal law claims against Ala-Koch and Koch Foods—Title VII sexual harassment, Title VII retaliation, and retaliation in violation of 42 U.S.C. § 1981. Both Koch entities move for summary judgment on these claims.  Upon review, the Court concludes that the Title VII sexual harassment claim (Count VI) will proceed to trial but the retaliation claims (Counts V and VII) will not.

#### 1. Title VII Sexual Harassment (Count VI)

In Count VI, Gray brings a Title VII sexual harassment claim, arguing that (1) she suffered a hostile work environment and (2) was constructively discharged.  For the

following reasons, summary judgment is due to be denied as to the hostile work environment claim but granted as to the constructive discharge claim.

### (i)  Hostile Work Environment

Title VII prohibits "hostile work environment" sexual harassment. *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 18–21 (1993). To establish a prima facie case of hostile work environment sexual harassment, a plaintiff must show "(1) that she belongs to a protected group; (2) that she has been subjected to unwelcome sexual harassment; (3) that the harassment was based on her sex; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that a basis for holding the employer liable exists." *Hulsey v. Pride Rests., LLC,* 367 F.3d 1238, 1244 (11th Cir. 2004).

The Koch defendants rest their summary judgment argument on Gray's inability to meet the third, fourth, and fifth elements of her prima facie case.  This Court's review of the evidence, in the light most favorable to Gray, reveals that Gray has established these three elements of her claim.

### (a) Based on Sex

To be viable under Title VII, challenged harassment must be "based on" or "because of" sex. *Hulsey*, 367 F.3d at 1244.  The Koch defendants argue that Gray cannot establish that she was harassed *because of sex* because McDickinson and Birchfield also allegedly harassed men.[8] In other words, the Koch defendants invoke what is known as "the equal

---

[8] Whether McDickinson and/or Birchfield harassed anyone at Ala-Koch, let alone both men and women, is a hotly disputed issue of fact. These defendants argue that they have never harassed anyone. Gray, however, alleges that McDickinson and Birchfield, at other times, made sexual advances to at least two male employees—Harvey Fuller

opportunity harasser defense,"[9] whereby harassers evade Title VII liability if they harass both sexes equally and therefore are technically not discriminating "based on sex." *See Henson v. City of Dundee,* 682 F.2d 897, 903–04 (11th Cir. 1982).

Gray argues that the Supreme Court's recent *Bostock* decision has effectively eliminated this defense. *See Bostock v. Clayton Cnty., Georgia*, 140 S.Ct. 1731 (2020). Regardless of whether *Bostock* has outright eliminated the defense, the Court concludes that a reasonable jury could find that Gray was harassed based on sex because Gray has pointed to a male comparator who was not harassed by the individual defendants.

While the outer implications of the *Bostock* decision are not yet defined, the Supreme Court nonetheless provided a "straightforward rule" as it pertains to causation in a Title VII case. *Id.* at 1741.  That is, causation is met when "changing the employee's sex would have yielded a different choice by the employer." *Id.*  "It doesn't matter if other factors besides the plaintiff's sex contributed to the decision.  And it doesn't matter if the employer treated women as a group the same when compared to men as a group.  If the employer intentionally relies *in part* on an individual employee's sex when deciding" to discriminate against the employee, there is a potential violation of Title VII. *Id.* (emphasis added.)

Applying this test here, the Court concludes there is a genuine issue of fact as to whether McDickinson and Birchfield targeted Gray because of her sex. Imagine, as

---

and Irish Jenkins. Regardless, as explained below, whether McDickinson and Birchfield had previously harassed men is not dispositive at this stage.

[9] Technically, this argument is not an affirmative defense that must be pleaded and proved by a defendant but is rather an argument that the plaintiff cannot meet her prima facie causation burden.

*Bostock* instructs, if Gray's gender is changed to male.  Would she have been harassed that evening in the garage?  If not, then she can show that she was harassed because of sex.

Here, the record suggests that Gray would not have been harassed that night if she was male because the other person in the garage that night— Steven Jackson—was a man, and he was not touched, propositioned for sex, or otherwise harassed by McDickinson and Birchfield. (Doc. 283 at 3.)  *See Oncale v. Sundowner Off Shore Servs.*, *Inc.*, 523 U.S. 75, 80–81 (1998) (discussing "direct comparative evidence about how the alleged harasser treated members of both sexes" as an evidentiary pathway to establishing the inference of discrimination in sex harassment cases). Instead, McDickinson's and Birchfield's alleged harassment that evening was exclusively directed at Gray, a woman.

Because Gray has identified a male comparator who was not harassed on November 14, 2015, she has sufficiently established a material issue of fact as to whether the harassment she allegedly experienced that evening occurred because of her sex, regardless of whether McDickinson and Birchfield had also sexually propositioned men on other occasions.[10]  At trial, the Koch defendants certainly can present evidence of McDickinson's liaisons with male Ala-Koch employees to contest this issue if they find it in their best interest to do so.  Nevertheless, this material issue of fact is a question for the jury.

---

[10] The Koch defendants' argument relies upon other incidents of harassment by McDickinson and Birchfield directed at other male employees.  As part of their summary judgment filings in this case, the Koch defendants have filed motions in limine to strike this "other incidents" evidence from consideration. (Docs. 312, 314, 316.) Taking them at their request, there would be no comparator evidence at all in the record and therefore the equal opportunity harasser defense falls away for lack of evidentiary support.  The Court, however, chooses not to engage in the pros and cons of this evidence and how it will play out at trial because the Court concludes that the presence of Steven Jackson at the November garage incident constitutes sufficient evidence for this claim to go forward in light of the equal opportunity harasser defense.

**(b) Sufficiently Severe Harassment**

The Koch defendants also argue that the alleged harassing conduct, even when viewed in the light most favorable to Gray, is not sufficiently severe or pervasive so as to establish the fourth element of her hostile work environment claim.   Although the alleged incidents of harassment are rather isolated in nature, the Court nonetheless concludes that a reasonable jury could find that the harassment was sufficiently severe to establish a hostile work environment claim.

Consideration of this issue implicates both a subjective and objective component. First, Gray must subjectively perceive the harassment as severe or pervasive enough to alter the terms and conditions of her employment and create a discriminatorily abusive work environment. *Hulsey*, 367 F.3d at 1247.  And second, her subjective perception must be objectively reasonable. *Id.*

Here, despite the Koch defendants' protestations, there is a genuine issue of material fact as to whether Gray subjectively found the environment sufficiently offensive. Gray testified that the harassment caused her severe stress, which eventually became so serious that she sought medical help for the anxiety it caused. (Doc. 242-4 at 74.) This testimony is sufficient, at least at this stage.  *See Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 68 (1986) (stating that the subjective severity question "turns largely on credibility determinations committed to the trier of fact."); *see also Dinkins v. Charoen Pokphand USA, Inc.*, 12 F. Supp. 2d 1254, 1262 (M.D. Ala. 2001) (finding that the subjective criteria is met where any "honest plaintiff" believes to be victimized).

Whether the environment was objectively severe is the more difficult question and is usually the battleground dispute between parties at this stage. Specifically, this case asks whether the alleged harassment, viewed in a light favorable to Gray, was so severe that the finder of fact could find Gray's work environment hostile notwithstanding the limited number of acts involved.

Typically, hostile work environment claims center around a campaign or pattern of repeated harassing conduct. *See Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 586 (11th Cir. 2000) ("All the sexual hostile work environment cases decided by the Supreme Court have involved patterns or allegations of extensive, long lasting, unredressed and uninhibited sexual threats or conduct that permeated the plaintiff's work environment."), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co v. White*, 548 U.S. 53 (2006). However, pervasive harassment is not necessary because the severe or pervasive test is disjunctive, meaning "[e]ither severity *or* pervasiveness is sufficient to establish a violation of Title VII." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010)(citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 743 (1998)).

Since the test is disjunctive, even isolated instances, although a much more rare circumstance, may satisfy the severe or pervasive requirement. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("[E]xtremely serious" isolated incidents can "amount to discriminatory changes in the terms and conditions of employment."). "Consequently, one or two instances . . . may satisfy the severe or pervasive element of a sexual harassment claim." *Avila-Zavala v. Sexton*, No. 2:17-CV-02168-AKK, 2019 WL 4202054, at *7 n.9 (N.D. Ala. Sept. 5, 2019); *see also Arafat v. Sch. Bd. of Broward Cnty.*,

549 F. App'x 872, 874 (11th Cir. 2013) (per curiam) (recognizing an isolated incident may be sufficiently severe but determining that an isolated shoulder touch was not sufficient because it was "unaccompanied by sexual suggestiveness or aggression"); *Hostetler v. Quality Dining, Inc.,* 218 F.3d 798, 808–09 (7th Cir. 2000) ("We have repeatedly recognized that even one act of harassment will suffice if it is egregious.").

The facts at issue here do not present the classic case of a pattern or campaign of harassment.  Instead, the facts focus largely on one off-site late-night incident along with a secondary confrontation at the workplace that involved less obvious sexual overtures.[11] Therefore, the sole question is whether these acts are severe enough, without the added weight of repetition over time or cumulation with other acts of harassment, to stand alone as the basis for a harassment claim. Holding such acts not to be severe as a matter of law is another way of saying that no reasonable person could think them serious enough to alter the plaintiff's work environment.

In assessing whether harassment is objectively severe or pervasive, courts typically look to: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was physically threatening and humiliating or just a mere utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance. *Faragher,* 524 U.S. at 787–88; *Johnson v. Booker T. Wash. Broad. Serv., Inc.,* 234 F.3d 501, 509 (11th Cir. 2000); *Mendoza v. Borden,* 195 F.3d 1238, 1246 (11th Cir. 1999).

---

[11] The Court is unconcerned by the fact that the garage incident occurred off-premises since McDickinson and Birchfield allegedly persuaded Gray to come to the house on the basis that they would be discussing work. *See Ellerth*, 524 U.S. at 748 (discussing an off-site incident of harassment in a hotel lounge during a business trip).

Instead of requiring proof of each factor individually, courts consider the totality of the circumstances. *See Hulsey*, 367 F.3d at 1247–48.  No single factor is required. *See Harris*, 510 U.S. at 23.

Importantly, this inquiry "requires careful consideration of the social context in which particular behavior occurs and is experienced by its target . . . [t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Oncale*, 523 U.S. at 81–82.

Considering the objective factors in the totality of the circumstances, the Court concludes that this case presents a rare set of facts where a reasonable jury could find that the alleged harassment was sufficiently severe despite the absence of a pattern or campaign of harassing conduct.[12] *See Hostetler*, 218 F.3d at 807 (finding harassment sufficiently severe when "two of three acts . . . involved unwelcome, forcible physical contact of a rather intimate nature.").

---

[12] Most courts have found that isolated incidents of sexual assault, ranging from rape to unwanted sexual touching, can create a hostile work environment. *See, e.g.*, *Sexton*, 2019 WL 4202054, at *4 (finding sufficiently severe conduct where the co-worker defendant made sexual verbal advances, and in two separate instances, began forcibly restraining and thrusting his groin into the plaintiff's pelvis and buttocks while the plaintiff was laying down); *but see Phillips v. Tekpak*, No. 16-00152-KD-B, 2017 WL 2963476, at * 1, 2 (S.D. Ala. July 11, 2017) (isolated incident insufficient to establish hostile environment claim when "[defendant] grabbed [plaintiff] by rear end, shook her rear end, made a grunting noise, and pushed her into a pallet"); *Parker v. Consol. Pipe & Supply Co*., No. 5:18-CV-1960-CLS, 2020 WL 1285842, at *7 (N.D. Ala. Mar. 18, 2020) (finding insufficiently severe conduct where a coworker jabbed a broomstick into the plaintiff's buttocks and taunted the plaintiff by placing the plaintiff's check stub in the open crotch of his pants and saying "come and get it."). *See also Lapka*, 517 F.3d at 983 ("We have held that assaults within the workplace create an objectively hostile work environment for an employee even when they are isolated."); *Lockard v. Pizza Hut, Inc.,* 162 F.3d 1062, 1067, 1072 (10th Cir. 1998) (finding a "single incident of physically threatening conduct," in which a customer pulled his waitress by the hair, and grabbed and placed his mouth on her breast, severe enough to create an actionable hostile work environment); *Fall v. Ind. Univ. Bd. of Trs.,* 12 F. Supp. 2d 870, 880 (N.D. Ind. July 23, 1998) ("[S]ingle incidents of severe physical harassment akin to a sexual assault will constitute actionable sexual harassment.").

Obviously, the first factor, frequency and pervasiveness, cuts against Gray. The alleged conduct was not pervasive but was rather two discrete events across the span of a week. *See Stancombe v. New Process Steel LP*, 652 F. App'x 729, 734 (11th Cir. 2016) (per curiam) (discussing two incidents of sexual assault within a week as not pervasive harassment).  Though other courts have found that the continued presence of alleged assaulters, and certain facially neutral conduct, like the seemingly benign text messages between McDickinson and Gray, can be considered in determining if the harassment was pervasive enough to alter the terms of employment, the Court need not rely on this in light of the analysis of the remaining factors. *See, e.g.*, *Lapka v. Chertoff*, 517 F.3d 974, 984 (7th Cir. 2008) ("The continued presence of a rapist in the victim's workplace can render the workplace objectively hostile because the rapist's presence exacerbates and reinforces the severe fear and anxiety suffered by the victim.");  *Davis v. Hosp. Staffing Sols., LLC(DE)*, No. 1:16-CV-1630-CAP-CMS, 2016 WL 8902590, at *3 (N.D. Ga. Dec. 9, 2016), *report and recommendation adopted sub nom. Davis v. Hosp. Staffing Sols., LLC (DE)*, No. 1:16-CV-1630-CAP, 2017 WL 2727859 (N.D. Ga. Jan. 19, 2017) (finding a viable hostile environment claim where an employer, upon having notice of an off-work-premises assault, allowed the accused harasser to sit next to the victim at work).

Even though the garage and office incidents are the only two instances of alleged overt harassment here, the next two factors, the severity of the conduct and whether it was physically threatening or humiliating, strongly weigh in Gray's favor.  The garage incident, viewed in the light most favorable to Gray, was extreme.  It was not only physically threatening, but actually physical.  Gray alleges she was sexually assaulted by two

individuals—simultaneously—while in a confined space on an occasion she thought was for the purpose of discussing work and a promotion. Gray further alleges that the harassment not only continued, but escalated each time she declined McDickinson's and Birchfield's advancements.

The severity of the garage incident is heightened by the fact that the harassment was a coordinated, simultaneous assault by two HR managers. Indeed, the alleged physical assault was not just one authority figure sexually assaulting Gray, but two such persons assaulting Gray at the same time, followed immediately by an indecent exposure and exhibitionist sex act. While at a supervisor's house, having been lured there under false pretenses, Gray was touched, "sandwiched" between two supervisors' bodies as they sexually rubbed against her, kissed her, and forced her to witness a sex act—all uninvited and despite her repeated refusals. In short, if true, these two HR supervisors crossed almost every physical and emotional boundary to coerce their subordinate to have group sex with them. Such conduct is inherently severe, physically threatening, and humiliating.

The fourth and final factor, interference with work performance, also weighs in favor of Gray, although not heavily. While Gray did remain at Ala-Koch for five months following the garage incident, a jury could nevertheless find that the harassment interfered with her work performance. According to Gray's testimony, she suffered stress to the point of seeking medical help for anxiety; she asked other employees not to leave her alone with McDickinson; she had to endure the presence of her alleged assaulters; she had to placate her alleged assaulters—individuals who had the power to discipline her; and she lost meaningful access to HR, the very department tasked with protecting Ala-Koch employees.

*See Olson v. Lowe's Home Ctrs, Inc.*, 130 F. App'x 380, 388 (11th Cir. 2005) (finding sufficient evidence that harassment interfered with the plaintiff's job where the plaintiff tried to avoid the harasser at work and plaintiff was unable to work at her previous level); *Johnson*, 234 F.3d at 509 (finding sufficient evidence that harassment interfered with plaintiff's job performance solely because the plaintiff "could not get along with her on-the-air co-host" (the alleged harasser)).   In addition, when Gray complained to Birchfield about perceived race discrimination by another employee, Gray was placed under the direct supervision of McDickinson, a final straw that ultimately led to her resignation several weeks later.

Weighing all four objective factors under the totality of the circumstances, the Court finds that a reasonable person could find the isolated harassment serious enough to alter Gray's work environment.

Nonetheless, the Koch defendants highlight the Eleventh Circuit's ruling in *Stancombe* to support their position that the two isolated instances were insufficiently severe as a matter of law to state a hostile work environment claim. *See Stancombe*, 652 F. App'x at 734.   However, the alleged facts here, when viewed in the "constellation of surrounding circumstances," are more extreme than those presented in *Stancombe*. *See Oncale*, 523 U.S. at 82.

In *Stancombe*, the Eleventh Circuit held that a co-worker touching the plaintiff's buttocks three times in succession and two days later approaching the plaintiff, who was alone and kneeling on the floor, grabbing his head, and making three pelvic thrusts in his face, was not "so severe as to amount to a discriminatory change in terms and conditions

of employment." *See Stancombe*, 652 F. App'x at 736. Still, despite falling short of the requisite severity needed, the Eleventh Circuit noted that the conduct was "wholly inappropriate" and "completely unacceptable." *Id*. at 736, 739.

Here, unlike in *Stancombe*, there was not one harasser but two, effectively doubling the severity and impact of the assault. And here, unlike in *Stancombe,* the touching escalated to unwanted kissing followed by an indecent exposure and exhibitionist sexual display. And, perhaps most saliently to the analysis of whether the harassment was severe enough to alter the terms and conditions of employment, here, unlike in *Stancombe*, the harassers were not just co-workers, or even just supervisors, they were two managers tasked by Ala-Koch to police against and stop the very harassment that Gray alleges. *See Meritor*, 477 U.S. at 77 (Marshall, J., concurring) ("[I]t is precisely because the supervisor is understood to be clothed with the employer's authority that he is able to impose unwelcome sexual conduct on subordinates."); *see also Hulsey*, 367 F.3d at 1248 ("Moreover, these weren't merely two co-workers. They were a supervisor and an employee under his supervision . . . .").

Considering these facts, a reasonable jury could find that the alleged conduct was not just "wholly inappropriate," but objectively severe enough to alter the terms and conditions of Gray's employment. *See Sexton,* 2019 WL 4202054 at *4 (finding sufficiently severe conduct where a co-worker made sexual verbal advances, and in two separate instances, began thrusting his groin into the plaintiff's pelvis and buttocks while the plaintiff was laying down). The garage incident—in conjunction with the office incident—could reasonably be interpreted by a jury to have been sufficiently invasive,

humiliating, and physically threatening so as to poison Gray's working environment, especially in the social context where the sexual assault was committed at the hands of the very people tasked with preventing harassment.

### (c) Employer Liability

The Koch defendants further argue that Gray cannot establish the fifth and final element of her hostile environment claim—employer liability.  To survive summary judgment, Gray must provide evidence from which a reasonable jury could conclude that the Koch defendants are liable for the harassment she suffered. *See Smelter v. S. Home Care Servs. Inc.*, 904 F.3d 1276, 1287 (11th Cir. 2018).  On this issue, Gray has also met her burden.

As an initial matter, the basis of an employer's liability for a hostile work environment depends on whether the harasser is the victim's supervisor or merely a co-worker.  Employer liability for a supervisor's sexual harassment can either be established directly or vicariously, while employer liability for a co-worker's harassment can only be established directly. *See Minix v. Jeld-Wen, Inc.*, 237 F. App'x 578, 579, 583 (11th Cir. 2007) (per curiam) (discussing an employer's liability for a supervisor's sexual harassment under both direct and vicarious liability theories); *see also Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1278 (11th Cir. 2002) (holding an employer directly liable for a supervisor's harassment and pretermitting a discussion of vicarious liability).

Here, it is undisputed that McDickinson and Birchfield were both supervisors within that term's meaning for Title VII purposes.[13] Therefore, because the alleged harassers were supervisors, not just co-workers, Gray can attach liability to Ala-Koch under either a direct liability theory or a vicarious liability theory.  A finding of vicarious liability will hold Ala-Koch liable for Birchfield's and McDickinson's alleged misconduct, including their conduct during the garage incident, while a finding of direct liability is limited to damages resulting from Ala-Koch's own negligence. *See Ellerth*, 524 U.S. at 753; *Minix,* 327 F. App'x at 581. At the summary judgment stage, Gray has established both theories of liability.

### a.  Direct Liability

Direct liability requires a showing that the employer "knew or should have known about the [sexual harassment] and failed to stop it." *Minix*, 237 F. App'x at 580 (quoting *Ellerth*, 424 U.S. at 759) ("[A]n employer can be liable [for a supervisor's] sexual harassment where its own negligence is a cause of the harassment. An employer is negligent with respect to sexual harassment if it knew or should have known about the conduct and failed to stop it.") (alterations in original).

---

[13] "[A]n employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). A "tangible employment action" is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance*, 570 U.S. at 429 (quoting *Ellerth*, 524 U.S. at 761). Relevant here, it is undisputed that McDickinson and Birchfield, at the time of the harassment, had been given the authority by Ala-Koch to take tangible employment actions against Gray. (Doc. 272-2 at 15.)

Gray argues that Ala-Koch knew of the harassment because: (1) McDickinson and Birchfield observed and participated in the harassment, and (2) Gray informed several of her co-workers about the garage incident. (Doc. 276 at 75–76.)

### i. Notice Created by Observation and Participation

An interesting nuance exists under the facts here.  And that is, Gray may not have needed to report the harassment to anyone for Ala-Koch to have had actual notice of the harassment because a supervisor, Birchfield, directly observed an employee being harassed by another supervisor, McDickinson. And not only did Birchfield do nothing to prevent the harassment as it occurred, he actively participated in and exacerbated it.

In *Smelter*,[14] the Eleventh Circuit held that a supervisor observing harassment and finding it funny could constitute actual notice to the employer *despite* the plaintiff's failure to otherwise report the harassment pursuant to the company's harassment policy. 904 F.3d at 1287. "Of course, [the supervisor] could not have found the racist remarks humorous if she had not overheard them. The record thus contains evidence that [the supervisor] had actual notice of the hostile work environment despite [the plaintiff's] failure to report it. And because [the supervisor] was [the plaintiff's] supervisor, we can impute [the supervisor's] notice to [the employer]." *Id*.

---

[14] While *Smelter* is a race-discrimination case, the actual notice test is identical, and courts have found race discrimination and sex discrimination cases to be instructive to each other. *See generally Henson v. City of Dundee*, 682 F.2d 897, 902 (11th Cir. 1982) ("[T]he principle of law equating illegal sex discrimination with a hostile work environment caused by sexual harassment 'follows ineluctably from numerous cases finding Title VII violations where an employer created or condoned a substantially (racially) discriminatory work environment, regardless of whether the complaining employees lost any tangible benefits.'"). There is no reason to differentiate whether an employer had actual notice of harassment on the basis of whether that harassment was sexually or racially based.

If a supervisor's observation of harassment, even in the absence of any complaint or report, is sufficient to constitute actual notice, then certainly a supervisor's observation of harassment, and subsequent participation in that harassment, can likewise constitute actual notice.[15] Here, not only did Birchfield observe the predicate harassment by McDickinson, he also participated in it after observing it. Under *Smelter*'s framework,[16] this is sufficient to impute liability to Ala-Koch, even if Gray never reported the harassment to other proper supervisors. *See Smelter,* 904 F.3d at 1287; *cf. Miller*, 277 F.3d at 1278 (finding that there was not actual notice where a high-level supervisor "was actually

---

[15] If *Smelter* is correct, there is actual notice here, even if Gray did not tell anybody about the harassment. Such an outcome makes sense: a supervisor observed harassment. The supervisor actually knew about the harassment in reality. His subsequent participation in that harassment does nothing to negate his knowledge about the harassment. If it did, then the ridiculous situation could arise where every supervisor in the company could be harassing an employee, leading the employee to have no one to report to, and yet—despite every supervisor knowing about the harassment—the employer would still not have "notice" because the supervisors' participation in the harassment shielded them from providing notice to the employer. Additionally, it is equally absurd to say that, on the one hand, Ala-Koch would have had notice of the harassment if the day after the garage-incident Gray had walked into Birchfield's office and officially reported the harassment to Birchfield himself; and on the other hand, had Gray not reported the harassment to Birchfield there would not be "notice" despite Birchfield's knowledge of the harassment through his observation. Rather than having a rule that leads to these absurd scenarios, the simple rule drawn from *Smelter* makes sense. And that rule is: when a proper supervisor observes unambigious harassment, the employer has notice of the harassment regardless of whether the harassment is officially reported and even if the supervisor later participates in the harassing conduct.

[16] For their part, Defendants argue that the Gray's *Smelter* argument only applies to an automatic liability theory; however, this is incorrect. Not only does *Smelter* itself never discuss tangible employment actions, vicarious liability, or automatic liability, but its discussion about notice is confined to actual notice under a direct liability theory. While the plaintiff in *Smelter* was ultimately terminated (a tangible employment action), that termination is irrelevant to whether the employer had actual notice of the ongoing hostile environment. Indeed, *Smelter* found that the employer—through the supervisor's observations of harassment—potentially had actual notice of the harassment in July and the plaintiff was not terminated until September. Whether the plaintiff was fired or not is irrelevant to whether the employer had actual notice of harassment when the supervisor obsevered the harassment.

Defendants are correct, however, in that recognizing *Smelter*'s applicability to this case effectively holds employers automatically vicariously liable in every instance where a supervisor observes sexual harassment (even if they later participate in the harassment) but does nothing to stop the harassing conduct, because the finding of actual notice under those facts would necessarily undermine an employer's potential *Faragher/Ellerth* defense. Indeed, this is the result here.

present" during harassment, but that the supervisor nonetheless had "constructive knowledge of the abuse" sufficient to serve as notice to the employer).

Because Ala-Koch "knew" of the garage incident, as it was happening, through Birchfield's observation, and failed to stop it or take any remedial action whatsoever, Ala-Koch can be held directly liable for the garage incident and the subsequent harassment during the office incident. *See Minix*, 237 F. App'x at 580.

### ii. Gray's Report Created Actual Notice

Even if Birchfield's observation and participation during the garage incident cannot impute actual notice to Ala-Koch, Gray contends that she notified Ala-Koch of the garage incident in four relevant ways because she told: (1) Sabrina Bell, a payroll clerk; (2) LaTonya Lockley, a quality assurance manager; (3) Tim Berry, a production supervisor; and (4) Francisco Santos, a shift manager.  If one of these conversations served as actual notice of the garage-incident to Ala-Koch, then Ala-Koch can be liable for any harassment it negligently failed to prevent after receiving that notice.[17] For the following reasons, the Court concludes that there is a triable issue of fact as to whether Gray's complaints about the garage incident provided Ala-Koch with adequate actual notice that should have triggered, at minimum, an investigation.

---

[17] The emphasis is on the prevention of future harassment. *See Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1305 (11th Cir. 2007) (recognizing a remedial action as adequate if the harassment stops). Here, that future harassment would include the office incident, the text message invitations, and "the continued presence of" McDickinson and Birchfield in Gray's workplace. *Davis v. Hosp. Staffing Sols.., LLC(DE)*, No. 1:16-CV-1630-CAP-CMS, 2016 WL 8902590, at *3 (N.D. Ga. Dec. 9, 2016), *report and recommendation adopted sub nom. Davis v. Hosp. Staffing Sols., LLC (DE)*, No. 1:16-CV-1630-CAP, 2017 WL 2727859 (N.D. Ga. Jan. 19, 2017) (finding a viable hostile work environment claim where an employer, upon having notice of an off-work-premises assault, allowed the accused harasser to sit next to the victim at work).

Ala-Koch's harassment policy requires that harassment reports be initially directed to either the "Shift Manager, Plant [] or Senior Location Manager, Complex Manager, or Complex HR Manager." (Doc. 247-1 at 169.)  Gray had a conversation about the garage incident at work with at least one of the individuals designated by Ala-Koch's policy to receive complaints: Francisco Santos.  Gray testified that she went to Santos specifically because he was the shift manager and because, given that HR supervisors were the subject of her complaint, she "didn't know anybody else to tell."[18] (Doc. 242-4 at 55.)

Given that Santos was a proper person to receive reports pursuant to the policy and given that Gray informed him of conduct that qualified as sexual harassment as defined by the Ala-Koch policy, the question here is whether the "information presented to [Santos] was sufficient" to trigger the remedial action required by the policy: a prompt investigation into the complaint. *Price v. Roanoke City Bd. of Educ.*, No. 3:06-CV-742-MEF, 2007 WL 3171376, at *7 (M.D. Ala. Oct. 26, 2007).

Whether Gray's conversation with Santos was substantively sufficient to put Ala-Koch on actual notice turns on several questions of fact that are undeveloped in the record. It is unclear from the deposition testimony if Gray "wished to lodge a sexual harassment complaint" to Santos, or if she was just having a "personal" conversation, as Santos claims. *See Coates v. Sundor Brands, Inc.,* 164 F.3d 1361, 1364–65 (11th Cir. 1999) (per curiam) (discussing a conversation where the plaintiff identified the conversation as "personal and

---

[18] Gray testified that she knew she could also report to Elrod but that she did not because she "did not feel comfortable telling Bobby Elrod." (Doc. 242-4 at 55.)  And Ala-Koch's own policy provides that an employee does not have to report to a person that she feels uncomfortable talking to. (Doc. 242-1 at 178.)

not professional" as being "sufficient to create a reasonable belief" that the supervisor need not address the conversation).  Gray testified that she disclosed the harassment to Santos because she "didn't know anybody else to tell." (Doc. 242-4 at 55.) Santos's deposition testimony indicates that he did not believe that Gray was complaining, but rather that they were just "talking." (Doc. 242-9 at 209.) Undisputed here is that Gray informed Santos, who was designated to receive and process harassment complaints, about an instance that squarely fit into Ala-Koch's own definition of sexual harassment, and Santos did nothing. The context and sufficiency of the conversation is a question properly resolved by a jury.

Without more information regarding the nuances of the conversation between Santos and Gray, the Court cannot rule as matter of law that Gray's disclosure to Santos was insufficient to give Ala-Koch actual notice of harassment.[19] *See, e.g.*, *Curry v. Koch Foods, Inc.,* No. 2:16-CV-02008-SGC, 2019 WL 1281196, at *14 (N.D. Ala. Mar. 20, 2019) (discussing one complaint to a person designated to receive such complaints as sufficient to create an issue of fact as to whether the employer had actual notice of harassment).

### b.  Vicarious Liability

Direct liability aside, Gray also argues that Ala-Koch can be held vicariously liable for the alleged harassment. The Koch defendants disagree, arguing that the *Faragher*/*Ellerth* affirmative defense bars liability. (Doc. 252 at 36.)

---

[19] Because a reasonable jury could conclude that Ala-Koch had actual notice of the garage incident, while it was happening, and of subsequent harassment because of Gray's conversation with Santos, the Court pretermits any discussion of whether a reasonable jury could also conclude that Ala-Koch had constructive notice of the harassment. *See Smelter,* 904 F.3d at 1288 (citing *Breda v. Wolf Camera & Video*, 222 F.3d 886, 890 n.5 (11th Cir. 2000)).

Employers may be held vicariously liable for the actions of their supervisors, even in the absence of negligence or notice.  Generally, "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate . . . authority over the employee." *Ellerth,* 524 U.S. at 765. If the harassing supervisor takes a tangible employment action against the victimized employee, the employer will be vicariously liable to the employee without the benefit of a legal defense. *See id.* at 762–63.  But "[w]hen no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages." *Id.* at 765.

As to the issue of a tangible employment action, Gray has failed to present sufficient evidence that such an action exists.  Her resignation months after the garage incident does not qualify as a tangible employment action unless the resignation was precipitated by an official action such as a demotion, failure to promote, or significant reassignment, amongst others, which it was not. *See Pa. State Police v. Suders*, 524 U.S. 129, 148 (2004) (explaining the difference between resignations based on official actions and resignations as a result of harassment); *Kurtts v. Chiropractic Strategies Grp., Inc.*, 481 F. App'x 462, 465 (11th Cir. 2012) (same). And neither does a simple memorandum of understanding, or the warning issued to Gray by McDickinson following Gray's two allegedly unexcused absences, count as a tangible employment action. *See Brown v. Snow*, 440 F.3d 1259, 1265 (11th Cir. 2006).   Therefore, where no tangible action was taken by Birchfield or McDickinson against Gray, Ala-Koch may avail itself of the *Faragher/Ellerth* affirmative defense.

33

The *Faragher/Ellerth* defense "comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth,* 524 U.S. at 765. The employer has the burden of proving each element by a preponderance of the evidence. *Id.*

At this stage, based on the facts presented here, Ala-Koch is unable to carry its burden on either prong of the defense.  Questions of fact exist as to whether Ala-Koch "exercised reasonable care to . . . correct promptly any sexually harassing behavior" and whether Gray "unreasonably failed to take advantage of any preventive or corrective opportunities" because, after all: (1) Birchfield observed harassment in the garage and did not stop it, and (2) Gray communicated her allegations to Santos who did nothing with the information.  *Id.*

Therefore, because Gray was allegedly harassed by her supervisors, and because Ala-Koch has not met its burden in establishing its *Faragher/Ellerth* defense, there is a genuine issue of fact as to whether Ala-Koch may be held vicariously liable for the alleged hostile work environment.  There being genuine disputes of materials facts as to all the challenged elements of Gray's hostile work environment claim, summary judgment is denied and the claim is ripe for a jury.

**(ii) Constructive Discharge**

As part of Count VI, Gray also alleges that she was constructively discharged as a result of McDickinson's and Birchfield's harassment. (Doc 5. at 21; Doc. 276 at 64.)  The

Defendants argue that the alleged harassment was not so intolerable that a reasonable person would have felt compelled to resign. (Doc. 252 at 41.)

As an initial matter, Gray coins her second theory for Title VII sexual harassment as a "tangible employment action" based on a constructive discharge. (Doc. 276 at 67.) But Gray's claim is more accurately a compound "hostile-environment constructive discharge claim." *See Suders*, 542 U.S. at 143–47.

Contrary to Gray's assertion, constructive discharges are not always tangible employment actions that warrant automatic liability. *Id.*  To be sure, constructive discharges can constitute tangible employment actions "if the plaintiff quits in reasonable response to an employer-sanctioned adverse action officially changing her employment status or situation, for example, a humiliating demotion, extreme cut in pay, or transfer to a position in which she would face unbearable working conditions." *Id*. at 134. But when "an official act does not underlie the constructive discharge," a hostile-environment constructive discharge claim arises when the employer has "the chance to establish, through the *Faragher/Ellerth* affirmative defense, that it should not be held vicariously liable*." Id.* at 149.

Here, Gray's resignation was not prompted by an official act like a "humiliating demotion, extreme cut in pay, or transfer," but was instead in response to the harassment she was allegedly enduring at the hands of McDickinson and Birchfield. *Id.*  At best, Gray can point to Birchfield moving Gray under McDickinson's direct supervision or perhaps to McDickinson's issuance of a memo to Gray regarding her absences as the "official acts" that should be designated as tangible employment actions; but those acts pale in

significance to those typically recognized as sufficient. *See Brown*, 440 F.3d at 1265 ("[A] tangible employment action . . . is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.").

A tangible employment action is an act that demonstrates to a company being charged with liability for its supervisor's conduct "that the supervisor has used his managerial or controlling position to the employee's disadvantage." *Suders*, 542 U.S. at 148. A toothless write-up for an absence without more does not amount to a supervisor using her controlling position to the employee's disadvantage, and therefore does not qualify as a tangible employment action. *See Brown*, 440 F.3d at 1265 (finding a poor performance evaluation insufficient unless the evaluation "led to a more tangible form of adverse action, such as ineligibility for promotional opportunities"); *Fields v. Atlanta Indep. Sch. Sys.*, 916 F. Supp. 2d 1348, 1363 (N.D. Ga. 2013) ("[W]arnings are not generally considered adverse employment actions for Title VII purposes."). And, a change in supervisors does not qualify either. *See McCoy v. Macon Water Auth.*, 966 F. Supp. 1209, 1221 (M.D. Ga. 1997) (finding that being required to report to a new supervisor each afternoon was not an adverse action).

Having found those two actions insufficient, Gray may only rely on the theory that her constructive discharge resulted from an allegedly hostile work environment, not a tangible employment action. Therefore, the claim falls under the hostile-environment constructive discharge test, where an employer can assert the *Faragher/Ellerth* affirmative defense. *See Suders*, 542 U.S. at 148. However, as explained below, the Court can dispose

of this claim before reaching the question of liability because the harassment Gray alleges was not sufficiently intolerable to support her claim of constructive discharge claim given the timeline of the events at issue.

"The constructive discharge here . . . can be regarded as an aggravated case of[] sexual harassment or hostile work environment." *Id.* at 146. "A plaintiff may bring a claim for 'constructive discharge' in violation of Title VII when the employee's working conditions were 'so intolerable that a reasonable person in [the employee's position] would have been compelled to resign." *Stancombe*, 52 F. App'x at 737 (quoting *Fitz v. Pugmire Lincoln-Mercury, Inc.* 348 F.3d 974, 977 (11th Cir. 2003)). To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment. *See Bryant v. Jones,* 757 F.3d 1281, 1298 (11th Cir. 2009) ("Establishing a constructive discharge claim is a more onerous task than establishing a hostile work environment claim.").

Ala-Koch argues that two allegations of sexual touching over a period of five months are not sufficiently severe to support Gray's constructive discharge claim. (Doc. 252 at 41–42.) The Court agrees. As already discussed, Gray's hostile work environment claim arguably lies on the margins of what a reasonable juror could consider sufficiently severe. Harassment which lies on the outer margins of severity for a hostile environment claim is almost necessarily insufficient for a constructive discharge claim. Afterall, constructive discharge claims require a greater severity than required to prove a hostile working environment.

37

And given the infrequent nature of the alleged harassment and that Gray continued working at Ala-Koch for five months after the physical harassment had ended and three months after any potential verbal harassment had ended, the Court concludes that Gray has not shown that her working conditions were "so intolerable that a reasonable person . . . would have been compelled to resign." *Stancombe*, 52 F. App'x at 737 (discussing two incidents of unwanted physical touching as insufficiently severe to state a hostile environment claim and especially a constructive discharge claim). Summary judgment is due to be granted as to Gray's constructive discharge claim.

### 2. Koch Foods's Liability For Title VII Sexual Harassment

While Ala-Koch appears to have been Gray's employer, Gray also seeks to hold Ala-Koch's parent company, Koch Foods, liable for Gray's sexual harassment claim under both joint employer and integrated enterprise theories. (Doc. 274 at 2.)  In response, Koch Foods argues that the companies are neither highly integrated nor joint employers and therefore that summary judgment should be granted in Koch Foods's favor.

With regard to Gray's joint employer theory, the Court concludes that Gray has failed to present sufficient evidence that Koch Foods exercised sufficient control over the terms and conditions of Gray's  employment, such as (1) the means and manner of Gray's work performance, (2) the terms, conditions, or privileges of Gray's employment, or (3) Gray's compensation. *See Tolar v. Bradley Arant Boult Cummings, LLP*, 997 F.3d 1280, 1300 (11th Cir. 2021); *Llampallas v. Mini–Circuits, Inc.,* 163 F.3d 1236, 1244–45 (11th Cir. 1998) (noting that the joint employer theory of liability is focused on "the degree of control an entity has over the adverse employment decision on which the Title VII suit is

based.").  Because the record is largely devoid of evidence concerning any control by Koch Foods over Gray's employment, the Court pretermits any further discussion of that theory, instead focusing on the integrated enterprise theory which compels a different conclusion.

As it concerns Gray's integrated enterprise theory, having reviewed the record in the light most favorable to Gray and having considered the liberal construction afforded the term "employer,"[20] the Court concludes there are questions of fact such that Koch Foods's summary judgment motion should be denied.

When two ostensibly separate entities operate as an "integrated enterprise," they are equally subject to liability for their employees' Title VII claims. *See Lyes v. City of Riviera Beach, Fla.*, 166 F.3d 1332, 1341 (11th Cir. 1999) (en banc) (discussing the "integrated enterprise" or "single employer test for attaching liability under Title VII).  To determine if nominally separate entities should be treated as a single, integrated enterprise, courts consider four factors: "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Id.* (*quoting McKenzie*, 834 F.2d at 933.) The second factor, whether there is centralized control of labor relations, is usually accorded greater weight than the others. *See Fike v. Goldkist, Inc.,* 514 F.Supp. 722, 726–27 (N.D. Ala. 1981).

---

[20] The Eleventh Circuit has held that "[c]onsistent with the purposes of the Act we interpret the term 'employer' liberally." *Virgo v. Riviera Beach Assoc., Ltd.,* 30 F.3d 1350, 1359 (11th Cir. 1994) (citing *McKenzie v. Davenport–Harris Funeral Home,* 834 F.2d 930, 933 (11th Cir.1987)); *see also Rogero v. Noone,* 704 F.2d 518 (11th Cir. 1983).

### (i)  Interrelation of Operations

"Courts are to consider several indicia of interrelatedness: '(1) combined accounting records; (2) combined bank accounts; (3) combined lines of credit; (4) combined payroll preparation; (5) combined switchboards; (6) combined telephone numbers; and (7) combined offices.'" *Klein v. L-3 Commc'ns Corp.*, No. 1:12-CV-956-MEF, 2013 WL 5913776, at *7 (M.D. Ala. Nov. 1, 2013) (*quoting Walker v. Boys and Girls Club of Am.,* 38 F. Supp. 2d 1326, 1331 (M.D. Ala. 1999)).

Rather than presenting any evidence related to these seven factors, Gray argues that Ala-Koch and Koch Foods's operations are interrelated because Bobby Elrod maintains an office at Ala-Koch's facility in Gadsden, Alabama, receives a paycheck from Koch Foods of Mississippi, supervises HR managers at various Koch entities across multiple states including Ala-Koch, and has a business card identifying Koch Foods as his employer. (Doc. 274 at 19.)  While Elrod's managerial role and relationship to both Koch Foods and Ala-Koch may be important for other reasons, Elrod's role does not sufficiently establish interrelation of operations. In the absence of any evidence showing combined accounting records, bank accounts, lines of credit, or telephone numbers between Ala-Koch and Koch Foods, this factor slightly weighs against Gray's claim that Koch Foods and Ala-Koch are a single employer.

### (ii) Centralized Control of Labor Relations

"[T]he 'control required to meet the test of centralized control of labor relations is not potential control, but rather actual and active control of day-to-day practices." *Fike*, 514 F. Supp. at 727.  Here, the Court focuses on "the degree of control an entity has over

the adverse employment decision on which the Title VII suit is based." *Llampallas*, 163 F.3d at 1244–45.

When evaluating this factor, a court may consider several "indicia of control" including "the authority to hire, transfer, promote, discipline or discharge; the authority to establish work schedules or direct work assignments, and the obligation to pay or the duty to train the charging party." *Lyes*, 166 F.3d at 1345 (11th Cir. 1999) (alteration adopted and internal quotation marks omitted) (quoting *Oaks v. City of Fairhope, Ala*., 515 F. Supp. 1004, 1035 (S.D. Ala. 1981)).

Gray highlights three facts relevant to the issue of control: (1) shared equal employment opportunity and immigration policies between Koch subsidiaries, (2) Elrod directly supervised the Ala-Koch HR department (i.e., supervised Birchfield), and (3) Wally Lewis, Koch Foods's Regional Vice President, directly supervised the operations at Ala-Koch's de-bone plant. (Doc. 274.)  This evidence does not sufficiently indicate that Koch Foods had centralized, active, day-to-day control of labor practices at Ala-Koch, including those over Gray, especially because Gray presents no evidence to demonstrate that Koch Foods, through Elrod, had the authority to hire, transfer, promote, discipline or discharge, the authority to establish work schedules or direct work assignments, or the obligation to pay or the duty to train Gray.  Accordingly, this factor weighs against Gray.

### (iii) Common Management

"This factor looks to whether the various entities share common officers and directors." *Anderson v. Surgery Ctr. of Cullman, Inc.,* No. 2:12-CV-00598-AKK, 2017 WL 6596611, at *4 (N.D. Ala. Mar. 31, 2017), *aff'd*, 839 F. App'x 364 (11th Cir. 2020). And

importantly, those shared common officers "translate[] into common management of the day-to-day activities of each entity." *Id*. (*quoting Walker v. Toolpushers Supply Co.*, 955 F. Supp. 1377, 1384 (D. Wyo. 1997)); *Stockett v. Tolin*, 791 F. Supp. 1536, 1551 (S.D. Fla. 1992) ("that the same persons . . . essentially managed and supervised the different entities, and that the companies had common officers and boards of directors, is evidence of the kind of common management that supports [this] prong of the [integrated enterprise] test").

As evidence of common management, Gray again points to Elrod and Lewis. (Doc. 274 at 19.)   Specifically, Gray highlights that Elrod, a self-described Koch Foods employee, supervised Birchfield and was the "ultimate decision maker regarding the promotion of Defendant Melissa McDickinson to the position of HR supervisor,"and that Lewis directly supervised Ala-Koch's complex manager.   Given Elrod's and Lewis's respective roles, the Court concludes that this factor weighs in Gray's favor. (*Id.*)

### (iv) Common Ownership or Financial Control

Gray has presented evidence that Koch Foods is the sole member of, and therefore owns, Ala-Koch. (Doc. 273-9.)  This factor weighs in Gray's favor.

### (v)  Consideration of All Factors

After considering all four factors, given the light in which the Court must consider the evidence, the Court concludes there is sufficient evidence to raise a genuine issue of material fact as to whether Ala-Koch and Koch Foods are integrated enterprises. *See McKenzie v. Davenport-Harris Funeral Home*, 834 F.2d 930, 933 (11th Cir. 1987) (finding an issue of fact as to single employer status where two entities shared ownership, had common managers, and had shared advertisement).  In short, the evidence presented by

Gray indicates common ownership, some common management especially as it concerns Ala-Koch HR employees, and to some extent, interrelatedness of operations. The Court cannot declare, as a matter of law, that Koch Foods and Ala-Koch are not integrated enterprises. Summary judgment on this issue is due to be denied.

### 3. Punitive Damages for Title VII Sexual Harassment

Also the subject of the Koch defendants' summary judgment motion is Gray's claim for punitive damages for the alleged sexual harassment attributable to McDickinson and Birchfield. Gray argues that punitive damages are warranted here because "[t]he very people responsible for ensuring [Ala-Koch] followed federal anti-discrimination laws are the ones who engaged in the very conduct prohibited by the law. [T]his is the very situation anticipated for punitive damages." (Doc. 276 at 94.) The Koch defendants reject this notion, arguing that "wrongdoing by managerial employments standing alone [is] insufficient to hold the employer liable for punitive damages." (Doc. 283 at 61.) For the reasons that follow, the Court concludes that the Koch defendants are not entitled to summary judgment on the issue of Gray's ability to seek punitive damages.

To recover punitive damages in her Title VII case, Gray must establish that the Koch defendants engaged in a discriminatory practice "with malice or with reckless indifference" to her federally protected rights. 42 U.S.C. § 1981a(b)(1). Malice or reckless indifference is established by a showing that the employer discriminated in the face of the knowledge that its actions would violate federal law. *Miller*, 277 F.3d at 1280. However, "the inquiry does not end with a showing of the requisite 'malice or . . . reckless indifference' on the

part of certain individuals . . . The plaintiff must [also] impute liability for punitive damages to the [employer]." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 539 (1999).

And in the Eleventh Circuit, "in order to ground [punitive] liability in an employer, the plaintiff must establish that 'the discriminating employee was high[] up the corporate hierarchy' or that the 'higher management countenanced or approved of his behavior.'" *Wilbur v. Corr. Servs. Corp.*, 393 F.3d 1192, 1205 (11th Cir. 2004) (quoting *Miller*, 277 F.3d at 1280); *Batayias v. Mech. Shop*, No. 4:19-CV-00015, 2020 WL 3972340, at *13 (S.D. Ga. July 14, 2020).

Therefore, to obtain punitive damages from the Koch defendants, Gray must establish (1) that McDickinson and Birchfield maliciously, or with reckless indifference, engaged in a discriminatory practice while knowing that their actions would violate federal law, and (2) that McDickinson and Birchfield were either high enough up in the corporate structure to warrant imputation to the Koch defendants, or that the Koch defendants' higher management countenanced their behavior. Based on the record and giving Gray the benefit of all favorable inferences, the Court finds that a genuine issue of material fact exists as to whether Gray is entitled to punitive damages.

The Court need not point to any other evidence aside from the fact that the sexual harassment alleged here was committed by two high-level HR employees including one who was a director. Of all people in any corporate environment, an HR director would know what is and is not acceptable and legal when it comes to the treatment of subordinate employees. And Birchfield ranked high enough in the corporate chain at Ala-Koch to make personnel decisions at a moment's notice, including the promotion of McDickinson and

transferring Gray to McDickinson's supervision. *See Wilbur*, 393 F.3d at 1205; *Dudley v. Wal-Mart Stores, Inc.*, 166 F.3d 1317, 1323 (11th Cir. 1999).

Further, given Birchfield's upper-level management position, and aside from his own personal participation in the alleged harassment, there certainly is sufficient evidence showing that higher management, here, Birchfield himself, countenanced or approved of McDickinson's behavior. *See Dudley*, 166 F.3d at 1323 (while "punitive damages will ordinarily not be assessed against employers with only constructive knowledge of the violations" when "higher management countenance[s] or approve[s]" of the discriminatory behavior, punitive damages are warranted).

Because questions of fact exist, the Koch defendants' motion for summary judgment is due to be denied as to this issue.

### 4. Title VII Retaliation for Filing the EEOC Charge

In Count VII, Gray brings a Title VII retaliation claim against the Koch defendants. Specifically, Gray alleges that she was retaliated against for filing her April 18, 2016 EEOC charge that implicated McDickinson and Birchfield in sexual harassment. Gray contends that Birchfield, almost immediately upon learning that Gray had filed the EEOC charge, contacted the Alabama Board of Nursing and reported Gray for fabricated misconduct. As Gray asserts, her retaliation claim rests on "Birchfield's retaliatory animus that prompted him to report false information to the Board of Nursing as an attack on Gray," not any subsequent admonishments levied by the nursing board. (Doc. 276 at 80–81.)

The Koch defendants argue that summary judgment is appropriate because Gray can neither establish a prima facie case of retaliation nor can she rebut that any adverse action

taken was legitimate and nonretaliatory. (Doc. 252 at 44–48.)  Although Gray can establish her prima facie case, the Koch defendants are correct that she cannot establish that the reason for the adverse employment action was pretextual.

### (i) Prima Facie Retaliation Case

To establish a prima facie retaliation claim, Gray must show that: (1) she engaged in an activity protected under Title VII, (2) she suffered an adverse employment action, and (3) and that "the adverse action was causally related to the protected activity." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013); *Knox. v. Roper Pump Co.*, 957 F. 3d 1237, 1244–45 (11th Cir. 2020). Once Gray establishes her prima facie case, the burden shifts to the Koch defendants to articulate a legitimate reason for the adverse action. *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006).  If the defendants do so, to avoid summary judgment, Gray must produce sufficient evidence for a reasonable fact-finder to conclude that each of the defendants' proffered reasons is pretextual. *Chapman v. AI Transp.,* 229 F.3d 1012, 1037 (11th Cir. 2000) (en banc); *Arnold v. Tuskegee Univ.*, 212 F. App'x 803, 811 (11th Cir. 2006) (per curiam).

The Koch defendants concede that Gray's EEOC charge qualifies as protected activity sufficient to establish the first element of her retaliation claim.  But they argue that Gray cannot establish the remaining elements because she cannot show (1) that she suffered an adverse employment action or (2) that there is a causal link between the protected activity and the purported adverse employment action. (Doc. 252 at 45–46.)

As to the adverse employment action issue, the first question is whether a complaint filed with a professional licensing board qualifies as a materially adverse action. The Court concludes that it does.

A materially adverse action is one that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006); *Monaghan v. Wordplay US, Inc.*, 955 F.3d 855, 861 (11th Cir. 2020). A complaint to a professional licensing board, meant to invite disciplinary action against a professional, might well dissuade a reasonable person from making or supporting a charge of discrimination, especially because licensing boards hold the keys to whether a professional can engage in her chosen profession. And further, such a complaint can negatively impact a person's future employment prospects.

While the Court has been unable to find a similar factual scenario involving a report to a professional licensure board, the scenario presented here is not too different from circumstances where courts have concluded that retaliatory police reports or child abuse reports are sufficient to constitute an adverse action to support a retaliation claim. *See Wenk v. O'Reilly*, 783 F.3d 585, 594 (6th Cir. 2015) (concluding that a report of child abuse could constitute an adverse action required to support First Amendment retaliation claim); *Rattigan v. Holder*, 643 F.3d 975, 986 (D.C. Cir. 2011) (holding a false security-threat referral to be an adverse action because it could cause a reputation damaging investigation and the possibility of termination); *Norris v. Opelika City Bd. of Educ.*, No. 3:18-CV-1057-RAH, 2020 WL 6784357, at *8 (M.D. Ala. Nov. 18, 2020) (holding a referral for child

abuse to constitute an adverse employment action because the referral and subsequent investigation stigmatized the plaintiff).

That the nursing board, upon completion of its investigation, ultimately acted upon the complaint to Gray's detriment is without consequence because the inquiry at this stage focuses on whether the complaint itself could well dissuade a reasonable worker from making or supporting a charge of discrimination; whether the complaint was based upon true facts is an issue more appropriate at the pretext inquiry. Here, Birchfield's actions certainly could dissuade a reasonable worker from engaging in protected activity.

Having sufficiently established that the nursing board complaint could constitute a retaliatory adverse action, Gray must next establish causation.  To do so, she must present sufficient evidence to create a genuine issue of fact as to whether her EEOC charge caused Birchfield to file the nursing board complaint. To establish causation, Gray must show that "her protected activity was a but-for cause of the alleged adverse action by the employer." *Knox*, 957 F.3d at 1245 (quoting *Univ. of Tex. Sw. Med. Ctr.*, 570 U.S. at 360).

Generally, when the person who took the adverse action is aware of the predicate protected conduct, "close temporal proximity between the employee's protected conduct and the adverse employment action" is sufficient to overcome summary judgment. *Brungart v. Bellsouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000). But the temporal proximity must be "very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *see also Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (per curiam) (holding three months to be too distant a period between protected

activity and adverse action to warrant an inference of causation solely on the basis of temporal proximity).

Here, Gray filed her EEOC charge on April 18, 2016, alleging McDickinson and Birchfield had sexually harassed her. (Doc. 3-1.)  Less than three weeks later, after learning about Gray's EEOC charge, and even after Gray had already resigned from Ala-Koch, Birchfield reported Gray to the nursing board.  The Court concludes the temporal proximity between Gray's EEOC charge and Birchfield's referral is sufficiently close to warrant an inference of causation for summary judgment purposes.  Therefore, Gray has presented sufficient evidence to create a genuine issue of material fact as to each element of her retaliation claim.

### (ii) Legitimate Reason and Pretext

The burden now shifts to the Koch defendants to establish a legitimate reason for filing the complaint with the nursing board. *Pennington v. City of Huntsville,* 261 F.3d 1261, 1266 (11th Cir. 2001) ("Once a plaintiff has established a *prima facie* case, the employer then has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action.").  Birchfield has provided a legitimate, non-retaliatory reason for reporting Gray to the nursing board: that employees reported to Birchfield that Gray did not adequately treat an employee with a head wound.  His reason is well-documented in the record. (Doc. 247-5 at 18.)

Because Birchfield had a legitimate, nondiscriminatory reason to file the nursing board complaint, the burden shifts back to Gray to show that the Koch defendants' proffered reason is  pretextual.  The inquiry at this stage asks whether Gray has produced

"reasons sufficient to allow a reasonable factfinder to determine that the defendant's proffered legitimate reasons were not what actually motivated its conduct." *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1258 (11th Cir. 2001) (quoting *Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994) (per curiam)).  Gray may show pretext by "demonstrating such weaknesses, implausibility, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find [those reasons] unworthy of credence." *Entrekin v. City of Panama City Fla*., 376 F. App'x 987, 997 (11th Cir. 2010) (quoting *Silvera,* 244 F.3d at 1258). "When an employer asserts misconduct by an employee as the legitimate reason for its action, the pretext inquiry focuses on the employer's beliefs and whether the employer was dissatisfied with the employee for nondiscriminatory reasons, 'even if mistakenly or unfairly so.'" *Siddiqui v. NetJets Aviation, Inc*., 773 F. App'x 562, 564 (11th Cir. 2019) (citing *Alvarez v. Royal Atl. Devs., Inc*., 610 F.3d 1253, 1266 (11th Cir. 2010)); *see also Elrod v. Sears, Roebuck & Co*., 939 F.2d 1466, 1470 (11th Cir. 1991) (noting that inquiry is not whether the employee was indeed guilty of misconduct but whether the employer in good faith believed so, and whether this belief was the reason for the adverse action).

Gray attempts to show that Birchfield's given reason for filing the nursing board complaint was pretextual by pointing to her own self-serving testimony.  This testimony, in isolation and in the context of the nursing board's investigation, is insufficient to create a question of fact.

First, employees who witnessed the incident reported to Birchfield that Gray had not properly treated the injured employee. (Doc. 247-5 at 9–10.)  Birchfield in turn reported

this information to the nursing board. (Doc. 242-7 at 830.)  Gray does not deny that Birchfield received complaints of inadequate treatment, nor does she reconcile the fact that Birchfield only reported her to the nursing board after receiving notice of her failure to treat the injured employee.  Indeed, Gray does not identify a single witness that corroborates her narrative that she did in fact treat the employee. [21]

And further, after conducting a thorough investigation during which every witness to the incident was interviewed, including the employee himself, the nursing board ultimately found that Gray had failed to adequately treat the employee. (Doc. 247-5 at 18.) Gray does not identify any issue with regard to the adequacy of the board's investigation, nor does she  argue that its results were flawed because they were premised upon false or incorrect information provided by Birchfield or McDickinson. Gray also does not point to any comparators that were not reported for similar conduct.

In short, Gray fails to sufficiently show any "weaknesses, implausibility, inconsistencies, incoherencies or contradictions" in Birchfield's proffered reason for filing the nursing board complaint. *Entrekin,* 376 F. App'x at 997.  Gray's conclusory, self-serving statement contradicts both internal reports of her conduct and the results from the investigation conducted by the nursing board.  Gray has not established that Birchfield's

---

[21] Gray relies solely on *Munoz v. Oceanside Resorts, Inc*. to argue that conflicting testimony from an employee and an employer about a specific incident is sufficient to create an issue of fact as to pretext. 223 F.3d 1340, 1345 (11th Cir. 2000).  However, in *Munoz*, there was much more than a conflicting testimonial dispute to establish pretext. *See id.* ("At trial, [the Plaintiff] presented a substantial quantum of evidence from which a reasonable jury could infer that the [defendant's] proffered explanation for his termination was pretextual."). Further, in *Munoz*, the testimony battle was only between the plaintiff and the decisionmaker, as opposed to the plaintiff and many witnesses to the alleged misconduct. (*Id.*)

report was pretext for retaliation. Accordingly, summary judgment is granted as to the Title VII retaliation claim (Count VII).

### 5. Title VII Retaliation for Complaining About Race Discrimination

Gray also brings a retaliation claim in Count V alleging that the Defendants retaliated against her for complaining about race discrimination.  Specifically, Gray alleges that she was retaliated against after lodging a complaint that Betty Stabler, another Ala-Koch employee, created a racially hostile work environment through racist language and disproportionate work assignments. (Doc. 276 at 81.) In response, the Koch defendants dispute Gray's ability to present a prima facie case on multiple grounds, including the absence of an adverse action. (Doc. 252 at 23.) The Court agrees with the Koch defendants. Gray suffered no adverse action for complaining about Stabler.

First, the only action that Gray points to as adverse is McDickinson's written warning to Gray regarding her two unexcused absences.  No evidence has been presented to show that this warning had any negative effect on Gray's salary, job status, or duties. *See Morales v. Ga Dep't of Hum. Res.,* 446 F. App'x 179, 184 (11th Cir. 2011) (holding that evaluations and reprimands that did not affect plaintiff's salary, job status or future pay raises were not adverse actions) (per curiam); *McKitt v. Ala Alcoholic Beverage Control Bd.*, No. 2:12-CV-673-WHA, 2013 WL 5406804, at *17 (M.D. Ala. Sept. 25, 2013), *aff'd*, 571 F. App'x 867 (11th Cir. 2014) (finding that "increased scrutiny, new office rules, or lateral transfer" did not "constitute[] a materially adverse employment action for a retaliation claim").

Second, to the extent Gray argues that her workload was increased in retaliation for lodging a complaint about Stabler, she has failed to support this assertion with sufficient evidence that her workload actually increased after complaining about Stabler. *See Collins v. Bd. of Trs. of Univ. of Ala.*, 211 F. App'x 848, 850 (11th Cir. 2006) (per curiam) (finding no retaliation where there was no evidence in the record supporting plaintiff's claim that her workload was increased because of protected activity). Summary judgment is due to be granted on this claim.

## B. Gray's State-Law Claims

Gray also brings three state-law claims against McDickinson and Birchfield:  assault and battery, invasion of privacy, and intentional infliction of emotional distress, also referred to as outrage.  McDickinson and Birchfield move for summary judgment on all three claims, largely on the basis of hotly disputed facts.  While the invasion of privacy and outrage claims are admittedly close calls, the Court concludes that summary judgment is due to be denied as to all three state law claims.

### 1.  Assault and Battery

Gray's assault and battery claim is largely based on the November 14, 2015 garage incident during which Gray alleges she was subjected to unwanted sexual touching by McDickinson and Birchfield. (Doc. 276 at 84.)

"The plaintiff in an action alleging assault and battery must prove (1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner." *Harper v. Winston Cnty.* 892 So. 2d 346, 353 (Ala. 2004) (citation omitted).  The plaintiff need not show "an

actual injury to the body" to establish a civil assault and battery. *Surrency v. Harbison*, 489 So. 2d 1097, 1104 (Ala. 1986).   Rather, "the wrong [of a battery] consists, not in the touching, so much as in the manner or spirit in which it is done, and the question of bodily pain is important only as affecting damages.*" Harper*, 892 So. 2d at 353.

Here, McDickinson and Birchfield argue that Gray's claim fails because the alleged touching "was not conducted in a harmful or offensive manner." (Doc. 252 at 55.)  As they put it, Gray was only "briefly touched" on the leg and lips as opposed to something that would have been truly harmful or offensive, such as if Birchfield "pinned her down, or threatened her." (*Id.*)

But Gray does not have to be "pinned down" to have suffered an actionable assault and battery.  The facts alleged by Gray, viewed in the light most favorable to her as the non-movant, constitute sufficient contact that a jury could certainly find was harmful and offensive.   Gray alleges that McDickinson and Birchfield confined her between their bodies, simultaneously rubbed themselves on her and, in Birchfield's case, kissed her. (Doc. 276 at 84.)  This type of uninvited, unwanted sexual touching can constitute harmful and offensive conduct under a claim of assault and battery. *See Ex parte Atmore Cmty. Hosp.*, 719 So. 2d 1190, 1194 (Ala. 1998) (finding a cause of action for battery when touching was "intentional . . . conducted with sexual overtones . . . and [] unwelcome."). As to Gray's assault and battery claim, McDickinson and Birchfield's summary judgment motion is due to be denied.

### 2.  Invasion of Privacy

Gray also brings a state law invasion of privacy claim on the basis that "McDickinson's and Birchfield's conduct invaded Gray's personal and emotional sanctum by physically touching her, subjecting her to sexual touching and sex acts." (Doc. 276 at 82.)  Given the severity of the alleged intrusion into Gray's mental and physical privacy, summary judgment is due to be denied on this claim.

To support an invasion of privacy claim under Alabama law, a plaintiff must show a "wrongful intrusion into [her] private activities in such a manner as to outrage, or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities." *Phillips v. Smalley Maint. Servs*, 435 So. 2d 705, 711 (Ala. 1983).  "To succeed on a claim alleging invasion of privacy relating to sexual harassment, a plaintiff must show: (1) that the matters intruded into are of a private nature; and (2) that the intrusion would be so offensive or objectionable that a reasonable person subjected to it would experience outrage, mental suffering, shame, or humiliation." *Ex parte Atmore Cmty. Hosp.*, 719 So. 2d at 1194.  Thus, a plaintiff must allege "something in the nature of prying or intrusion" by a defendant. *Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820, 826 (Ala. 1999) (citation and quotation marks omitted).

Whether sexual harassment constitutes an invasion of privacy is a fact-intensive inquiry.  For example, on one hand, "asking a co-employee for a date and making sexual propositions usually [does] not constitute an invasion of privacy." *Ex parte Atmore Cmty. Hosp.*, 719 So. 2d at 1194. But on the other hand, "extensive egregious inquiries into one's sex life, coupled with intrusive and coercive sexual demands, constitute[s] a wrongful

intrusion into one's private activities" sufficient to sustain a claim. *Stevenson*, 762 So. 2d at 826.

Nevertheless, "[w]here the Alabama Supreme Court has found sexual harassment to constitute a state claim of invasion of privacy, the underlying allegations have involved prying or intrusive comments or behavior—typically explicit sexual requests, direct and invasive questioning, *or violations of physical privacy*." *Tison v. Alachua Straw Co. LLC*, 444 F. Supp. 3d 1344, 1356 (M.D. Ala. 2020) (emphasis added).  In decisions that have found no viable privacy claim, there often was *only* repeated verbal harassment, but not in the nature of prying or intrusion. *See id.* at 1357 (granting summary judgment on intrusion claim based on "repeated comments that [were] very clearly inappropriate"); *McIsaac v. WZEW-FM Corp.*, 496 So. 2d 649, 650 (Ala. 1986) (affirming summary judgment on intrusion claim based on repeated propositions and attempts to kiss the plaintiff).  Whereas allegations involving physical acts have been found sufficient to support an invasion of privacy claim. *See, e.g.*, *Phillips*, 435 So. 2d at 711; *Ex parte Atmore Cmty. Hosp.*, 719 So. 2d at 1194.  "Put simply, under Alabama law, severe harassment must be of a prying nature to constitute an invasion of privacy." *Tison*, 444 F. Supp. 3d at 1357.

Despite primarily occurring on one night, the alleged harassment here tracks more closely with the cases where invasion of privacy claims were deemed viable.  Viewing the facts in Gray's favor, the harassment alleged here was severe because it was of a prying nature.  Indeed, it was sexual assault.  According to Gray, she was not merely subjected to repeated verbal harassment of the sexual variety that night, but explicit sexual propositions, multiple physical invasions, direct contact to her body, and an exhibitionist oral sex

display.   These are sufficient allegations upon which a reasonable jury could rely in concluding Gray's privacy was invaded. Although McDickinson and Birchfield vehemently dispute Gray's allegations, this factual dispute is one for resolution by the jury. Accordingly, summary judgment is denied on this claim.

### 3.  Outrage

"Under Alabama law, the tort of outrage is an extremely limited cause of action that applies to three kinds of conduct: (1) wrongful conduct regarding burial matters; (2) barbaric methods used to coerce an insurance settlement; and (3) egregious sexual harassment." *Stancombe*, 652 F. App'x at 739; *see also Thomas v. BSE Indus. Contractors, Inc.,* 624 So. 2d 1041, 1044 (Ala. 1993).  The claim only applies "in the most egregious circumstances." *Kilgore v. Thompson & Brock Mgmt., Inc.,* 93 F.3d 752, 755 (11th Cir. 1996).   A plaintiff must show that "(1) that the defendant either intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from his conduct; (2) that the defendant's conduct was extreme and outrageous; and (3) that the defendant's conduct caused emotional distress so severe that no reasonable person could be expected to endure it." *Jackson v. Ala. Power Co*., 630 So. 2d 439, 440 (Ala. 1993).   Indeed, outrage only protects against conduct that is "beyond all possible bounds of decency . . . [and is] atrocious and utterly intolerable in a civilized society." *Busby v. Truswal Sys. Corp.*, 551 So. 2d 322, 324 (Ala. 1989) (per curiam).

Generally, courts have been "loathe to find outrage," believing it "to be one of the many 'kitchen-sink' claims a plaintiff throws into her complaint to be certain that no claim, however frivolous, is left unmade." *Brewer v. Petroleum Suppliers, Inc.,* 946 F. Supp. 926,

936 (N.D. Ala. 1996).  Subsequently, courts have held that the "mere request for sexual favors [is] not sufficient [to support a claim]. *Id.* Nor are demands which, if refused, carry a consequence of economic loss. . . ." *Id.* (citations omitted).

Still, despite outrage's heavy burden, courts have found allegations of sexual harassment to be sufficiently egregious to support a claim. *See Busby*, 551 So. 2d at 324 (finding outrage where the defendant committed a slew of verbally obscene harassment and "put his arm around the plaintiffs, grabbed their arms, and stroked their necks"); *Edwards v. Hyundai Motor Mfg. Ala., LLC*, 603 F. Supp. 2d 1336, 1345, 1355 (M.D. Ala. 2009) (finding outrage where defendant "touched [the plaintiff's] leg in a suggestive manner; blocked her path in the corridors of the plant; shook his genitals at her; put his hands behind his back and intentionally bumped up against her; pulled her pony tail; asked her very explicit and vulgar questions about her sex life; and repeatedly propositioned her sexually"); *Jeffers v. Russell Cnty. Bd. of Educ.*, No. 3:06-CV-0685-WKW, 2008 WL 410621, at *14 (M.D. Ala. Feb. 13, 2008) ("[The defendant] also made lewd remarks and gestures, but went above and beyond that through his physical contact of biting [the plaintiff] on the breast and pushing her head down while jumping over her in the nude."); *Mills v. Wex-Tex Indus., Inc.*, 991 F. Supp. 1370, 1386 (M.D. Ala. 1997) (finding a claim for outrage where the defendant repeatedly touched the plaintiff in a sexual way); *Brewer*, 946 F. Supp. at 936 (finding outrage where a supervisor touched the plaintiff's buttocks and breasts, pressed against her, and made sexual propositions).

Almost all of the decisions finding egregious sexual harassment share a common denominator: sexual touching. But when the sexual touching is a one-time incident, the incident must be egregious and not just completely unacceptable. *See Stancombe*, 652 F. App'x at 739 ("No doubt the act of grabbing another's head and, while fully clothed, making pelvic thrusts in his face is boorish, vulgar, and completely unacceptable, but we cannot say that this one-time incident was so outrageous as to satisfy the requisite element of the tort of outrage.").

Defendants contend that Gray has not presented sufficient evidence to establish that (1) McDickinson's and Birchfield's conduct was sufficiently egregious and (2) that Gray suffered severe emotional distress as a result of the conduct. (*See* Doc. 249.)  Working backwards, it is clear that there is at least a triable issue of fact as to whether the alleged harassment caused Gray to suffer severe emotional distress.  After all, Gray testified that it caused her to be so distressed that she sought medical treatment for anxiety. *See Edwards*, 603 F. Supp. 2d at 1355 (M.D. Ala. 2009) (finding evidence that the plaintiff "broke down in tears, lost sleep, and even sought medical help because of depression that may have resulted from the [defendant's] behavior" as sufficient to create an issue of fact as to whether there was significant emotional distress).  Whether this prong has been met does not turn on Gray's ability to present evidence from a physician or other appropriate medical expert.  It can instead turn on Gray's own ability to testify about the severity of her emotional distress, which she has done in her deposition and may do again at trial.  *Id.* (relying only on the plaintiff's testimony about her emotional distress to send the issue of "extreme emotional distress" to a jury).

Whether the individual defendants' conduct was sufficiently egregious to support an outrage claim is a much closer call.  But, as an initial matter, it cannot be disputed that an outrage claim can exist in the realm of sexual harassment and assault.  And, if the alleged conduct is viewed in the light most favorable to Gray, the conduct at issue here could constitute criminal harassment, indecent exposure, and criminal assault.[22] *See United States v. Burnett*, 545 F. Supp. 2d 1207, 1210 (N.D. Ala. 2008), *aff'd in part*, 291 F. App'x 319 (11th Cir. 2008) (discussing a case where a man was charged with indecent exposure for exposing his penis to another without consent).

Here, as in other cases where sufficient evidence of outrage was found, the alleged harassers were attempting to force sexual liberties through physical impositions, and in this case, did so.  *See Brewer*,  946 F. Supp. at 936 (N.D. Ala. 1996).  Although the Eleventh Circuit has found that a one-time physical, sexual assault was insufficient to support a claim of outrage, the facts here go well beyond a one-time fully clothed assault committed by one person. *See Stancombe*, 652 F. App'x at 739.  During the garage incident, there were two sexual assaults occurring in coordinated tandem, followed by an indecent exposure and exhibitionist sex act.  In short, there is enough evidence to allow Gray's outrage claim to go forward.  Summary judgment is due to be denied.

### 4.  **Ala-Koch's Vicarious Liability for the State Law Torts**

For Ala-Koch to be held vicariously liable for these state tort claims, Gray must show that: (1) the employee's "wrongful acts were done in the line and scope of [their]

---

[22] Defendants hone in on this salient point while highlighting the severity of Gray's allegations in the briefing for their defamation and invasion of privacy counterclaims. (Doc. 267-1 at 28–29, referencing Ala. Code §§ 13A-6-68, 13A-13-21; 13A-11-8.)

employment;" (2) the employee's "acts were in furtherance of the business;" or (3) Ala-Koch "participated in, authorized, or ratified the wrongful act." *Patterson v. Augat Wiring Sys., Inc.*, 944 F. Supp. 1509, 1521 (M.D. Ala. 1996) (quoting *Joyner v. AAA Cooper Transp.*, 477 So. 2d 364, 365 (Ala. 1985)).  Ala-Koch argues that Gray cannot meet her burden.  The Court disagrees.

Gray first argues that McDickinson's and Birchfield's sexual harassment was within the scope of their employment because these two supervisory-level employees used "work" as the excuse and vehicle to proposition and harass Gray in the evening hours of November 14, 2015.  This argument mechanically fails as a matter of law.  In Alabama, "where a co-employee defendant's behavior is aimed at satisfying the co-employee's own lustful desires, [the Alabama Supreme Court] has held that no corporate purpose could conceivably be served." *Atmore Cmty. Hosp.*, 719 So. 2d at 1194; *see also Busby*, 551 So. 2d at 327 (Ala. 1989).

However, Gray also argues that Ala-Koch ratified McDickinson's and Birchfield's actions. *Patterson*, 944 F. Supp. at 1521 (finding vicarious liability appropriate where the employer "participated in, authorized, or ratified the wrongful act"). To show ratification, in addition to proving that the offending employee committed a tort, "a complaining employee must show that the employer (1) had actual knowledge of the tortious conduct of the offending employee and that the tortious conduct was directed at and visited upon the complaining employee; (2) that based upon this knowledge, the employer knew, or should have known, that such conduct constituted sexual harassment and/or a continuing tort; and (3) that the employer failed to take 'adequate' steps to remedy the situation."

*Edwards*, 603 F. Supp. 2d at 1358 (quoting *Potts v. BE & K Const. Co.*, 604 So. 2d 398, 400 (Ala. 1992)).

Gray has met all three ratification showings. First, as discussed in the Title VII analysis, Ala-Koch had actual notice of the garage incident through Birchfield's observation of what McDickinson was doing and personal participation in the tortious conduct. *See Smelter*, 904 F.3d at 1287. Second, Birchfield, being an HR director, certainly "knew or should have known" that the conduct in the garage constituted "sexual harassment and/or a continuing tort." *Edwards*, 603 F. Supp. 2d at 1358. And third, since Birchfield took no steps whatsoever to remedy the harassment, he cannot have taken "adequate steps to remedy the situation." *Id.* Therefore, Gray has met her burden in establishing that Ala-Koch can be held vicariously liable for the alleged tortious conduct under a theory of ratification.[23]

---

[23] Gray also argues that McDickinson's and Birchfield's conduct was ratified because of (1) complaints made to Elrod about McDickinson and (2) Gray's conversations/complaints to co-workers after the garage incident. Neither of these arguments, unlike Birchfield's observation and participation, are sufficient to uphold a ratification theory.

First, Gray argues that a jury could find that McDickinson's and Birchfield's alleged conduct was ratified because "Elrod had notice from numerous complaints and failed to protect Gray." (Doc. 276 at 89.)  Despite Gray failing to identify any of these "numerous complaints" supposedly made to Elrod, the Court infers that Gray refers to complaints made about other employees and their respective issues with McDickinson and Birchfield. While complaints from other persons about inappropriate conduct may establish constructive notice for other purposes, ratification requires the employer to have had "actual knowledge of the tortious conduct . . . *visited upon the complaining employee*." *Edwards*, 603 F. Supp. 2d at 1358 (emphasis added). Therefore, any complaints unrelated to Gray, however "numerous," cannot establish that Ala-Koch had actual notice as to the harassment of Gray for ratification purposes.

And second, neither can any of the conversations Gray had with her co-workers after-the-fact impute to Ala-Koch "actual knowledge of the tortious conduct" directed at Gray. Gray's post-incident conversation with shift-manager Francisco Santos may have given Ala-Koch actual notice of sexual harassment sufficient for Title VII liability purposes, but the conversation was insufficient to provide Ala-Koch actual notice of torts involving physical touching of Gray because the record establishes that Gray only told Santos that McDickinson and Birchfield had oral sex in front of her.  While this may qualify as sexual harassment under Ala-Koch's anti-harassment policy, such acts, standing alone, do not provide sufficient notice for establishing vicarious liability for the intentional torts at issue here and certainly not for intentional torts that already had occurred.  *See Busby*, 551 So. 2d at 327 (holding that an employee's "generalized complaints" that did not convey "the details or the full extent of the conduct" by the offending

### 5.   Negligent Supervision and Retention by Ala-Koch

Gray also brings state law claims for negligent supervision and retention against Ala-Koch. (Doc. 5.)   Ala-Koch argues that it is entitled to summary judgment because "Gray fails to present any evidence that Ala-Koch knew or should have known of McDickinson's or Birchfield's alleged tortious conduct." (Doc. 283 at 56.)   Gray counters, arguing there were prior complaints about McDickinson and that Birchfield, who was having a sexual relationship with McDickinson, was put in charge of investigating those complaints. Gray further notes that she complained to Santos and others about the garage incident and "the nature of McDickinson's and Birchfield's positions [as Human Resource managers]" gave Ala-Koch constructive and actual notice of McDickinson's incompetency as an employee and her propensity to engage in improper and harassing workplace conduct. (Doc. 276 at 91.)   Based upon the record presented, the Court concludes that this claim should proceed against Ala-Koch.

As a threshold matter, Gray's claim must begin with proof of "the underlying tortious conduct of an offending employee." *Potts v. BE & K Const. Co.*, 604 So. 2d 398, 400 (Ala. 1992); *see also Tison v. Alachua Straw Co. LLC*, 444 F. Supp. 3d 1344, 1359 (M.D. Ala. 2020); *Edwards v. Hyundai Motor Mfg. Alabama, LLC*, 603 F. Supp. 2d 1336,

---

employee is insufficient to hold an employer vicariously liable in the outrage context);  *Edwards*, 603 F. Supp. 2d at 1358 (finding no vicarious liability for an assault and battery claim and an outrage claim where there was evidence that the employer knew of "inappropriate behavior" but "there [was] no evidence that [the employer] actually knew . . . that [the defendant] had touched [the plaintiff] in a rude or offensive way").

63

1357 (M.D. Ala. 2009). Here, Gray has overcome summary judgment on her three state law tort claims, and therefore, she overcomes this threshold issue.

Turning to notice and knowledge, there is confusion between the parties as to the notice and knowledge requirements to support a negligent retention and supervision claim. Pertinent to the primary tortious event—here, the garage incident—the notice issue turns on what was known before that incident, not after.

To support her negligent supervision claim, Gray first argues that Ala-Koch had constructive notice because Ala-Koch knew McDickinson and Birchfield were harassing employees prior to the garage incident and therefore should have known they would continue harassing employees. To prove constructive knowledge, Gray points to: (1) the August 2015 rumors that McDickinson was having inappropriate sexual interactions with at least two Ala-Koch employees in exchange for time off, (2) the concerns voiced by Davenport and Lewis about the rumors they were hearing about McDickinson, and (3) Harvey Fuller's EEOC charge alleging harassment by McDickinson.

Fuller's EEOC charge is insufficient to provide notice of incompetency or of McDickinson's sexual propensities because Gray has failed to present evidence that Ala-Koch was aware of the charge before the November garage incident. This leaves for consideration the August 2015 rumors about McDickinson's workplace activities that were reported to Davenport and Lewis and in turn submitted to Birchfield for investigation.

Birchfield claims to have investigated the rumors and found them unsubstantiated and without credibility. This investigation allowed McDickinson to remain in her position at Ala-Koch. Needless to say, Birchfield was not a neutral player when there is evidence

to suggest that Ala-Koch was aware of the rumors that McDickinson and Birchfield were engaged in an inappropriate workplace romance themselves at the time. (Doc. 242-7 at 462.) Further cutting against Birchfield's neutrality is his participation in the garage incident and then later marrying McDickinson following his resignation from Ala-Koch.

There is also evidence that after the garage incident but before the office incident, Gray told Santos about the garage incident.  Santos was a person designated by Ala-Koch to receive complaints and concerns about inappropriate conduct.  Santos, however, chose not to further investigate Gray's allegations.

Overall, viewing the evidence in the light most favorable to Gray, the Court concludes there are material questions of fact about the negligent retention and supervision claim, and in particular, Ala-Koch's knowledge about McDickinson's sexual behavior in the workplace.  After all, Birchfield knew about the concerns regarding McDickinson, both as a result of the notice provided to him by Davenport and Lewis and through his own inappropriate workplace relationship with McDickinson, a person to whom he is now married.  Summary judgment is due to be denied as to this claim.

### 6.  Koch Foods's Liability for the State Law Claims

In her Third Amended Complaint, Gray also seeks to hold Ala-Koch's parent company, Koch Foods, liable for McDickinson's and Birchfield's actions.  Koch Foods responds in its summary judgment motion that it cannot be held liable because Ala-Koch is not the alter-ego of Koch Foods. (Doc. 248 at 12.)  The Court need not analyze whether Ala-Koch is an alter-ego of Koch Foods, or vice-versa, because Gray effectively has abandoned this claim through her failure to brief and argue this issue. *See Coal. for the*

*Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000)

(collecting cases) ("The appellants' failure to brief and argue this issue during the

proceedings before the district court is grounds for finding that the issue has been

abandoned."); *Brasseler, U.S.A I, L.P. v. Stryker Sales Corp.,* 182 F.3d 888, 892 (Fed. Cir.

1999) (affirming the "unremarkable proposition that assertions made in the pleadings [,] .

. . but not made in opposition to a motion for summary judgment, need not be considered

by the district court . . . in ruling on the motion for summary judgment"); *see also Stubbs*

*v. City of Ctr. Point, Ala.,* 988 F. Supp. 2d 1270, 1276 (N.D. Ala. 2013).

Indeed, unlike her arguments regarding Koch Foods's liability for her Title VII

claims,[24] not once in her briefing does Gray argue why Koch Foods should be held

vicariously liable for the state-law claims committed by McDickinson and Birchfield.

Therefore, the Court concludes that this allegation of liability has been abandoned or

waived to the extent it was ever asserted. Summary judgment is due to be granted in favor

of Koch Foods.

## C. Defendants' Counterclaims Against Gray[25]

Given the stubbornness with which the facts are disputed in this case, perhaps it is

unsurprising that McDickinson and Birchfield bring counterclaims of their own against

Gray; claims for defamation and false light invasion of privacy.[26] (Doc. 48.)  Both counts

---

[24] *See supra* at 24; (Doc. 274.)

[25] For these claims, the Court views the facts in the light most favorable to McDickinson and Birchfield as the nonmovants.

[26] Upon representations made to the Court during an in-person hearing held on October 14, 2021, McDickinson and Birchfield have withdrawn their argument for slander per quod and only argue for *per se* slander. Here, the allegedly false statements would qualify as slander *per se* given that the statements potentially impute four separate indictable

operate under the same basic premise: Gray is lying.  According to these defendants, Gray communicated her lies to numerous individuals, defaming McDickinson and Birchfield and harming their reputations.  In response, Gray makes two legal arguments: (1) that she did not publish the allegedly false statements, and (2) the statements were privileged. (*See* Doc. 254 at 22–26.)  For the foregoing reasons, Gray's motion for summary judgment is due to be denied as to the defamation claim and granted as to the invasion of privacy claim.

### 1.  Defamation

In support of their defamation counterclaim, McDickinson and Birchfield allege that Gray made false and defamatory statements alleging that they were involved in a sexual relationship with one another and had sexually harassed Gray.  They claim that Gray made these statements to numerous Ala-Koch employees, including Sherri Gonzalez, Tonya Lockley, Tim Berry, Steven Jackson, and Sabrina Bell.

"To establish a prima facie case of defamation, the plaintiff must show that the defendant was at least negligent, *see Mead Corp. v. Hicks,* 448 So. 2d 308, 313 (Ala. 1983); *Restatement (Second) of Torts* § 558, § 580 B (1977), in publishing a false and defamatory statement to another person concerning the plaintiff, *Restatement (Second) of Torts* § 558. The statement is either actionable without having to prove special harm (actionable per se) or actionable upon allegations and proof of special harm (actionable per quod). *Restatement (Second) of Torts* § 558; *see also Albert Miller & Co. v. Corte,* 107 F.2d 432 (5th Cir. 1939), *cert. denied, Corte v. Albert Miller & Co.,* 309 U.S. 688 (1940); *Warren v.*

---

offenses to McDickinson and Birchfield: harassment, assault, indecent exposure, and adultery.  *See Butler v. Town of Argo*, 871 So. 2d 1, 17–18 (Ala. 2003) (discussing "adultery" as a sufficient "crime of infamy or moral turpitude" so as to support a claim for slander per se).

*Birmingham Bd. of Educ.*, 739 So. 2d 1125, 1132 (Ala. Civ. App. 1999).  Publication in the defamation context arises when there is a "communication of a defamatory matter to a third person." *Nelson v. Lapeyrouse Grain Corp.*, 534 So. 2d 1085, 1093 (Ala. 1988).

There is no dispute that Gray communicated an allegedly defamatory matter to a third person—she admits that she told these five individuals about the actions of McDickinson and Birchfield.  Gray argues instead that there was no publication as a matter of law because "communications between managerial personnel or between fellow corporate employees, if made in the line and scope of their duties, do not constitute a publication by either the corporation or the employees of the corporation." *Hoover v. Tuttle*, 611 So. 2d 290, 293 (Ala. 1992); *see also Nelson*, 534 So. 2d at 1093 (Ala. 1988).

Gray's argument fails because, although her disclosures were communications to fellow employees, whether these communications were made in furtherance of Ala-Koch's business, in the line and scope of employees' duties, or for Gray's own personal agenda, are contested issues appropriately resolved by a jury.  Indeed, Gray offers little context for why she spoke about McDickinson and Birchfield with fellow Ala-Koch employees who were not responsible for receiving employee complaints of harassment.  Had Gray's statements been made solely to Santos for the purpose of complying with corporate policy to instigate an investigation, then perhaps the defamation claim would fail. *See Nipper v. Variety Wholesales, Inc.*, 638 So. 2d 778, 781 (Ala. 1994);  *Burks v. Pickwick Hotel*, 607 So. 2d 187, 189 (Ala. 1992) (per curiam);  *Hoover*, 611 So. 2d at 293.  But those are not the circumstances here.  Gray has failed to show that there is no issue of material fact on the publication issue.

Gray further argues that these communications were subject to an absolute and qualified privileged. *See Warren v. Birmingham Bd. of Educ.*, 739 So. 2d 1125, 1132–33 (Ala. Civ. App. 1999) (discussing absolute and qualified privilege as defenses to defamation). This is so, according to Gray, because these communications were reports of harassment. (Doc. 254 at 26.)   While statements made in a judicial or quasi-judicial proceeding, like an official statement made to the EEOC, are absolutely privileged, gossip or accusations of harassment that are completely detached from formal proceedings are not absolutely privileged. *See Redmon v. Auto*, No. 2:13-CV-313-SRW, 2014 WL 4855023, at *6 (M.D. Ala. Sept. 29, 2014) ("[A]pplying Alabama precedent to the present context, the court concludes that Alabama's absolute privilege extends to statements that were made in connection with, and were relevant to, the administrative proceedings before the EEOC arising from plaintiff's charge of employment discrimination.").   And here, Gray has failed to show why communications to individuals not designated by Ala-Koch to receive such complaints were relevant or necessary for complying with the anti-harassment policy or related to a judicial or quasi-judicial proceeding.

And to the extent Gray raises a conditional or qualified privilege argument, she has failed to show her entitlement to a judgment as a matter of law, when the facts are viewed in the light favorable to McDickinson and Birchfield, because there is a question of fact as to whether Gray's communications were made in good faith and free of malice. *See Gore v. Health-Tex, Inc.*, 567 So. 2d 1307, 1308 (Ala. 1990) ("It is well established that absent a showing of malice, an action alleging slander will not lie where there is a conditional or qualified privilege.");  *Cantrell v. N. River Homes, Inc*., 628 So. 2d 551, 554 (Ala. 1993)

("[T]he disposition of actual malice by summary judgment is generally inappropriate."). After all, McDickinson and Birchfield contend that Gray intentionally made these accusations to advance her own personal agenda.

Accordingly, Gray is not entitled to summary judgment on the defamation claim on grounds of privilege.

## 2.  Invasion of Privacy

Birchfield and McDickinson's false light invasion of privacy claim also rests on the same accusations made by Gray to her fellow employees.[27]  Gray also moves for summary judgment on this claim, arguing the same legal defenses she did in response to the defamation claim.  This claim, however, compels a different outcome.

Under Alabama law, the "false light" tort is met when "[o]ne . . . gives publicity to a matter concerning another that places the other before the public in a false light" if the false light was "highly offensive to a reasonable person." *Butler*, 871 So. 2d at 12 (quoting *Schifano v. Greene County Greyhound Park, Inc.*, 624 So. 2d 178, 180 (Ala. 1993)

---

[27]  In their brief opposing summary judgment, McDickinson and Birchfield point to over a dozen discrete communications made by Gray.  None of these additional communications were included in their pleadings and therefore will not be considered. "It is well settled that '[a] plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment.'" *Varazo v. Keiser Corp.*, 754 F. App'x 918, 919 (11th Cir. 2018) (quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004)). In any event, even if these additional communications were considered—the communications that occurred outside the confines of Ala-Koch are too vague to be considered "highly offensive" for the purposes of an invasion of privacy claim, and the rest join the originally plead communications as having occurred inside the confines of Ala-Koch. *See Pouncy v. Vulcan Materials Co.*, 920 F. Supp. 1566, 1583 (N.D. Ala. 1996) ("[T]here is no evidence that the comments allegedly made by [the defendants] were made outside the confines of [the company], therefore, [the plaintiff] could not have been subjected to publicity that would violate ordinary decencies or that would create a false image of [the plaintiff] in the public's eye.").

(emphasis omitted)(quoting Restatement (Second) of Torts § 652E (1977)). The issue in this case is the "publicity" requirement.

While defamation only requires communication to a third person, false light invasion of privacy requires that Gray give "publicity" to her false statements.  "Publicity" is defined by communicating the false statements "to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Ex parte Birmingham News, Inc.,* 778 So. 2d 814, 818 (Ala. 2000).  That is, communication to a "single person or even to a small group of persons" is insufficient for publicity. *Id.*

Here, McDickinson and Birchfield allege only that Gray communicated individually to approximately five fellow employees.  That is insufficient to constitute "publicity" as defined by Alabama law. *See Butler,* 871 So. 2d at 21(finding a communication to five people in the office of the city clerk to be insufficient to have given a matter publicity); *Pouncy*, 920 F. Supp. at 1583 (N.D. Ala. 1996) (finding no publicity where comments were allegedly only made within the confines of a company); *Rosen v. Montgomery Surgical Ctr.*, 825 So. 2d 735, 736 (Ala. 2001) (finding no publicity where statements were made to one co-worker who subsequently communicated it to at least two other co-workers). Summary judgment is therefore due to be granted on this claim.

## V.    CONCLUSION

Accordingly, it is hereby ORDERED as follows:

1.    The Motion for Summary Judgment filed by Koch Foods of Alabama, LLC (Doc. 251) is granted in part and denied in part.  It is GRANTED as to Counts V and VII, but DENIED as to Counts I, II, III, IV, and VI.

2.      The Motion for Summary Judgment filed by Koch Foods, Inc. (Doc. 248) is granted in part and denied in part.  It is GRANTED as to Counts I, II, III, IV, V, VII but DENIED as to Count VI.

3.      The Motion for Summary Judgment filed by Melissa McDickinson (Doc. 249) is DENIED.

4.      The Motion for Summary Judgment (Doc. 250) filed by David Birchfield is DENIED.

5.      The Motion for Summary Judgment filed by Ka'Toria Gray (Doc. 253) is granted in part and denied in part. It is GRANTED as to Count II of the Counterclaims, but is DENIED as to Count I.

6.      The claims for hostile work environment sexual harassment, assault and battery, invasion of privacy, outrage, and negligent training and retention alleged by Gray shall proceed to trial against Ala-Koch.

7.      The claim for hostile work environment sexual harassment shall proceed to trial against Koch Foods, Inc.

8.      The claims for assault and battery, invasion of privacy, and outrage alleged by Gray shall proceed to trial against Melissa McDickinson and David Birchfield.

9.      The claim for defamation alleged by Melissa McDickinson and David Birchfield against Ka'Toria Gray shall proceed to trial.

DONE, on this the 14th day of January, 2022.

           /s/ R. Austin Huffaker, Jr.

R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE